In re Howard C. SATURLEY and
Geraldine F. Saturley,
Debtors.

Bankruptcy No. 91–10072.

United States Bankruptcy Court,
D. Maine.

Sept. 6, 1991.

Kim M. Vandermeulen, Vandermeulen, Goldman, Allen & O'Brian, Augusta, Me., for debtors.

Charles H. Abbott, June Zellers (Schau), Skelton, Taintor & Abbott, Auburn, Me.

Gary M. Growe, Bangor, Me., trustee.

## MEMORANDUM OF DECISION

JAMES B. HAINES, Jr., Bankruptcy Judge.

Pending are the Chapter 7 debtors' former counsels' fee application and the trustee's responsive motion seeking a determination that the fees presently sought, and those previously paid, are excessive. For the reasons set forth below, the fee applica-

tion is disapproved, with exceptions for certain, limited reimbursement requests; and the applicant is ordered to surrender a portion of its pre-petition fees and all unapplied retainer funds to the trustee.[1]

## BACKGROUND

### 1. *Retention, Representation and Reckoning.*

In October 1990, Howard and Geraldine Saturley retained Attorney Charles H. Abbott and his firm, Skelton, Taintor & Abbott ("Skelton, Taintor") of Auburn, Maine. The Saturleys were headed for personal bankruptcy. Casco Northern Bank ("Casco") had called loans to several Saturley-owned corporations and was pursuing the Saturleys' personal guaranties.

When they first met, Howard Saturley, who had already spoken with other attorneys, told Attorney Abbott that a Chapter 7 filing appeared "inevitable." Attorney Abbott explored alternatives to straight bankruptcy, including a Chapter 11 filing, negotiating releases of guaranty obligations, and obtaining Casco's commitment to forbear. He negotiated terms for surrender of the Saturley corporations' assets to Casco.

Research commenced on bankruptcy issues no later than October 14, 1990.[2] As late as October 29, however, the Saturleys were still searching for options other than Chapter 7. On November 6, Casco attached the Saturleys' personal assets, including funds held by Skelton, Taintor as its retainer. The die was cast.

On approximately December 20, 1990, Attorney June Z. Schau, a Skelton, Taintor associate, researched dischargeability issues and commenced preparing the Saturleys' bankruptcy schedules.[3] She complained that the information Howard Saturley gave her was incomplete and that he eventually became uncooperative, failing to return her calls. Attorney Schau found the records relating to the Saturleys' real estate interests particularly confusing.[4] Ultimately, she ordered title searches at each county deed registry in the state of Maine and in one New Hampshire registry.

Howard Saturley expressed dissatisfaction with Skelton, Taintor's efforts at completing the bankruptcy schedules. He asserted that documents were lost or misplaced and that the firm's attorneys and paralegals refused to act upon the information he supplied. He claimed that the information set forth in the schedules ultimately filed "came right out of" the records he provided to the firm. In the end, having decided to engage new counsel, he ceased returning calls to Attorney Schau and her staff.

### 2. *Fees, Funds and Filings.*

Howard and Geraldine Saturley filed their joint Chapter 7 petition on January 29, 1991. Attorney Schau appeared as the Saturleys' counsel. The petition was unaccompanied by schedules or by a Rule 2016(b) disclosure of attorney compensation.[5] Schedules were filed, but Skelton,

---

**1.** This memorandum constitutes the court's findings of fact and conclusions of law, as modified in minor respects following reconsideration on the applicant's motion. Bankruptcy Rules 9014, 7052. *See* Fed.R.Civ.P. 52. The Bankruptcy Rules were amended, in ways not material to today's decision, on August 1, 1991. At that time they were designated the "Federal Rules of Bankruptcy Procedure." They will be referred to throughout this memorandum as the "Bankruptcy Rules" and cited as "B.R."

**2.** Bankruptcy research may have commenced even earlier. A one-hour time entry on the firm's records for October 8 describes "research" of "federal law."

**3.** The firm's itemized statement demonstrates that Attorney Schau spent 3.6 hours on the case

in October, only 2.8 hours in November, and that her efforts on behalf of the Saturleys began in earnest in mid-December.

**4.** Attorney Schau received "three or four cartons" of raw material with which to work. The Saturleys had interests in 12 to 14 family corporations and their records disclosed many asset transfers between and among the Saturleys and their closely-held corporations. The records were sometimes at odds with Mr. Saturley's recollections.

**5.** Bankruptcy Rule 2016(b) requires that every attorney for a debtor, whether or not he or she applies for compensation, file a statement satisfying the requirements of 11 U.S.C. § 329. It must include "a statement of the compensation

Taintor's Rule 2016(b) statement was not forthcoming.[6] Several weeks later, when another attorney appeared for the Saturleys, Skelton, Taintor sought leave to withdraw.[7] Leave was granted forthwith.[8]

On March 18, 1991, Skelton, Taintor filed its application seeking approval and payment of $27,209.00 in fees for services rendered and reimbursement of $4,584.55 in expenses incurred while representing the Saturleys in the pre-petition and post-petition periods. The application represented that the firm had received and was then holding $26,009.42 as a retainer. The firm subsequently supplemented its application, seeking an additional $768.00 in fees and an additional $2,199.88 in expenses. Thus, the application now addresses $27,977.00 in professional fees and $6,784.43 in expenses.

The fee application references pertinent bankruptcy rules,[9] and represents that the firm commenced representation of the Saturleys on November 6, 1990, continuing through February 14, 1991.[10] Although it disclosed the unapplied retainer, it did not indicate that any fees were paid to the firm by the Saturleys in the year preceding the filing.[11] Contemporaneously with the application for compensation, the firm filed a motion "seeking authority to use cash collateral." [12]

The Chapter 7 trustee objected to the fee application and sought a determination that Skelton, Taintor's fees and expenses were excessive.[13] At the first hearing on the application for compensation and the trustee's counter-motion, Attorney Schau appeared on behalf of Skelton, Taintor. In response to the court's inquiries, she acknowledged that the firm had already received $10,371.30 from the debtors [14] and that its retainer had been substantially more than the reported $26,009.42. The court set the application for an evidentiary hearing and ordered Skelton, Taintor to revise its itemized billings to comply with the requirements of the local bankruptcy rule.[15]

---

paid or agreed to be paid" for services rendered or to be rendered "in contemplation of or in connection with" the case within the year preceding the filing of the petition. Rule 2016(b) requires the statement to be filed within 15 days of the entry of the order for relief. The order for relief was entered on January 29, 1991, the date the petition was filed. 11 U.S.C. § 301.

6. On March 8, 1991, the Saturleys filed their statement of affairs, indicating that they had paid Skelton, Taintor "$40,000.00, some of which was paid to other consultants," for bankruptcy work. An extension of the period within which to file schedules previously had been granted. See Bankruptcy Rule 1007(a)(4).

7. Kim J. Vandermeulen, Esq., entered his appearance as counsel for the debtors on February 21, 1991. The motion seeking leave to withdraw was filed the following day. Attorney Vandermeulen did file his own Rule 2016 statement disclosing that he had received a $2,000.00 retainer for his services.

8. The motion was granted on February 22, 1991. Although new counsel had appeared by the time the motion to withdraw was filed, other motions were then pending. As a consequence, leave of court was required before counsel's withdrawal could be effective. See Maine Bankruptcy Rule (Me.B.R.) 9010(c)(1).

9. B.R. 2016, Me.B.R. 2016.

10. Application of Bankruptcy Counsel for Debtor for Approval of Counsel Fees and Reimbursement of Expenses. The application stated at paragraph 2 "The undersigned attorneys were counsel to Howard C. and Geraldine F. Saturley, the debtors, from November 6, 1990 through February 14, 1991."

11. *Id.* See 11 U.S.C. § 329(a), B.R. 2016(a).

12. Motion for Approval of Use of Cash Collateral, dated March 15, 1991. See 11 U.S.C. § 363(a); B.R. 4001(b). The merits of the motion are discussed *infra* n. 18 and accompanying text.

13. The trustee's objection to the fee application invoked § 329(b)(1) and B.R. 2017.

14. A pre-petition fee payment was generally disclosed in Skelton, Taintor's response to the trustee's motion. Objection to Trustee's Motion to Determine Whether Debtors' Payment to Attorney is Excessive, dated April 17, 1991.

15. Me.B.R. 2016(a). The direction to revise the application issued from the bench. Subsequently, the firm filed a motion seeking clarification of the order, asserting that the requirement for detailed billing presented a novel task. "Since this is the first time this issue has ever been raised with regard to Counsel's bill in the Bankruptcy Court, Counsel would like some instruction from this Court as to whether Counsel should attempt to break down the billing each day by task." Ex Parte Motion for Clarification, dated April 24, 1991. The resulting order direct-

Skelton, Taintor subsequently filed itemized bills dating back to October 5, rather than November 6, 1990.[16] The evidence disclosed that, through the first week in November, the firm received four separate retainer payments from the Saturleys, totalling $36,380.72.[17] The firm applied $10,371.30 to the Saturleys' bill in four separate transactions prior to November 6.[18]

### Discussion

#### 1. *The Cash Collateral Question.*

■ Contemporaneously with its application for compensation, Skelton Taintor filed a motion seeking leave to use cash collateral so that, notwithstanding Casco's attachment, it could apply the retainer funds against its fees. The motion alleges that Casco's attachment lien on the Saturleys' retainer is junior to the firm's own possessory lien and, in any event, that Casco's attachment was preferential.[19] Casco, the debtor, and the Chapter 7 trustee, understandably, have ignored the motion.

Section 363(c) addresses use, sale or lease of property by a trustee[20] and expressly conditions post-filing use of "cash collateral"[21] in the operation of a debtor's business.

This is a Chapter 7 bankruptcy. The debtors are not operating their business as they might under other chapters. There is no order authorizing the trustee to conduct the debtors' business.[22] The cash collateral motion is patently inappropriate. To obtain a declaration of priority over the claims of Casco, or to see Casco's lien avoided, alternative remedies must be invoked[23] by the proper parties.[24]

#### 2. *The Retainer: Funds On Hand and In Hand.*

The fee application, as originally filed and as supplemented, represented that the Saturleys "provided a retainer to counsel in the amount of $26,009.42."[25] However, Skelton, Taintor later disclosed that it had

---

ed counsel's attention to Me.B.R.2016(a)(1), in effect since October 1, 1988, which provides:

> (a) *Application for Compensation.*
> (1) The "detailed statement" required by Bankruptcy Rule 2016(a) shall, at a minimum, contain the date each task was performed, the name of the individual performing such task and a description of the nature of each service performed and the time expanded in its performance. The application shall state the hourly rate of each professional, associate and assistant, and a total of the hours expended by each professional, associate and assistant. The time expenditures shall be broken down into tenths of an hour (six-minute periods). In addition, the application for compensation shall be accompanied by a brief narrative summary describing the applicant's principal services and the results achieved.

**16.** The revised billing statement was filed as an exhibit to the firm's pre-hearing memorandum and later received in evidence as Hearing Exhibit 2.

**17.** The payments were as follows: $1,000.00 on October 15; $16,000.00 on October 18; $4,380.72 on October 30; and $15,000.00 on November 6, 1990. Hearing Exhibit No. 1.

**18.** The retainer was applied to the bill as follows: $1,000.00 on October 22; $5,589.40 on October 25; $2,916.10 on October 31; and $865.80 on November 6, 1990. Casco attached

the retainer by trustee process on November 6, 1990, preventing further applications to satisfy billings. *See* Me.R.Civ.P. 4A and 4B (1991); 14 M.R.S.A. § 4151.

**19.** Motion for Approval of Use of Cash Collateral, dated March 15, 1991. The motion was served on the bank.

**20.** "Trustee" includes a Chapter 11 debtor-in-possession. 11 U.S.C. § 1107(a). 11 U.S.C. § 363(c) generally permits ordinary course transactions to be carried out when a debtor's business is authorized to be operated under 11 U.S.C. §§ 721, 1108, 1304, 1203 or 1204.

**21.** *See* 11 U.S.C. § 363(a) (defining cash collateral) and § 363(c)(2) (prohibiting use of cash collateral without permission or court order). *See also* B.R. 4001(b), Me.B.R. 4001(b) (setting forth procedures for obtaining cash collateral order).

**22.** *Cf.* 11 U.S.C. § 721.

**23.** *See* B.R. 7001 (defining adversary proceedings to include actions to determine extent and priority of liens and actions to avoid preferential transfers).

**24.** *See* 11 U.S.C. § 547(c) (preference avoidance is invoked by the trustee).

**25.** Application of Bankruptcy Counsel for Debtor for Approval of Counsel Fees and Reimbursement of Expenses at 2.

received over $36,000.00.[26]

At the initial hearing, and in its first memorandum supporting its application, counsel urged that the retainer it received from the debtors was an "advance payment" retainer, fully-earned pre-petition and, therefore, not property of the estate. *See In re McDonald Bros. Constr., Inc.,* 114 B.R. 989, 997–1000 (Bankr.N.D.Ill.1990) (describing different categories of retainers, including the "classic" retainer, the "security" retainer and the "advance payment" retainer). Thus, it claimed that application for leave to apply the retainer was unnecessary. *See Stewart v. Law Offices of Dennis Olson,* 93 B.R. 91, 93–94 (N.D.Tex.1988). Skelton, Taintor declared that it was prompted to file a fee application merely on account of the "uncertainty created by the [attachment] lien of Casco Northern Bank...."[27]

■ Whatever may be said about the force of the argument[28], it was merely a convenient fallacy. By the time of the evidentiary hearing, Skelton, Taintor had wisely abandoned its "earned on receipt" contention. Attorney Abbott's testimony and the firm's records established that the retainer was a "security retainer" kept in the firm's trust account pending application against invoices for fees. Funds yet to be applied to billings constitute funds "belong-ing in part to a client and in part presently or potentially to a lawyer or law firm" under pertinent bar rules.[29] *See In re McDonald Bros. Constr., Inc.,* 114 B.R. at 999. The debtors retained an interest in the unapplied retainer as of the date their case commenced, and that fund is part of the bankruptcy estate. 11 U.S.C. § 541(a)(1). *See Id.* at 1000.

■ The $10,371.30 applied to the firm's bills before filing is not part of the estate. When those funds were removed from the firm's trust account and applied to the balances due for services rendered and expenses incurred, Saturleys ceased to have an interest in them. *Cf. In re Bicoastal Corp.,* 118 B.R. 855, 857 (Bankr.M.D.Fla. 1990) (ownership of pre-petition retainer passed to firm at time services were performed). However, such funds are subject to an order for disgorgement if the court finds the payments were "excessive."[30]

Whether by fee application filed under § 330 and B.R. 2016 or by motion brought pursuant to § 329(b) and B.R. 2017, Skelton, Taintor's compensation, including its proposed application of the retainer, is subject to scrutiny. *See In re Chapel Gate Apartments, Ltd.,* 64 B.R. 569, 574 (Bankr. N.D.Tex.1986). *In re Bader,* 118 B.R. 817 (Bankr.N.D.Fla.1990). *Cf.* Me.B.R. 2016(b) (requiring disclosure of retainers and requiring motion to obtain authority to dis-

26. *See supra* n. 17.

27. Memorandum in Support of Application for Approval of Counsel Fees and Reimbursement of Expenses at 3 n. 2.

28. *See In re N.B.I., Inc.,* 129 B.R. 212, 21 Bankr. Ct.Dec. 1367 (Bankr.D.Colo.1991) (refusing to approve fee agreement calling for earned on receipt retainers). *See also In re Hathaway Ranch Partnership,* 116 B.R. 208, 216 (Bankr. C.D.Cal.1990) (advance payment retainers likely cannot be enforced in bankruptcy court).

29. *See* Me.Bar Rule 3.6(f)(1)(ii). The United States District Court for the District of Maine has adopted the Maine Bar Rules Code of Professional Responsibility. U.S. District Court Local Rule 5(d). Thus, it governs conduct in bankruptcy matters, as well. Me.B.R. 9029 (adopting District Court Local Rules).

30. 11 U.S.C. § 329 provides:

(a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

(b) If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to—

(1) the estate if the property transferred—

(A) would have been property of the estate; or

(B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12 or 13 of this title; or

(2) the entity that made such payment.

tribute retainer funds in Chapter 11 proceedings).

### 3. *Considering Compensation for Counsel.*

 In a Chapter 7 case, it is not necessary that the court approve the retention of debtor's counsel. *In re Trinsey,* 115 B.R. 828, 832 (Bankr.E.D.Pa.1990); *In re Spencer,* 48 B.R. 168, 171 (Bankr. E.D.N.C.1985). However, the law has long held that a debtor's dealings with his or her own attorneys are subject to careful examination. The court has an independent obligation to scrutinize fee applications, whether or not formal objections are lodged. *See In re Casco Bay Lines, Inc.,* 25 B.R. 747 (Bankr. 1st Cir.1982). *See also In re Eastern Maine Electric Coop, Inc.,* 121 B.R. 934, 937 (Bankr.D.Me.1990); *In re Leonard Jed Co.,* 118 B.R. 339 (Bankr.D.Md.1990). The Code and rules carve out for special treatment the matter of compensation paid, and to be paid, debtor's counsel. 11 U.S.C. § 329; B.R. 2017.

 Neither § 329 nor Rule 2017 is a recent innovation.[31] Transactions between a debtor, particularly a Chapter 7 debtor, and his counsel on the eve of bankruptcy may lead to excesses in fee expenditures occasioned by foreknowledge that the assets so expended will be surrendered in any event,[32] by the debtor's unwillingness to "strain his relationship with his life-rope, his attorney,"[33] and by the timidity of other counsel who, although adverse, may expect payment from the estate, as well.[34] Thus, counsel undertaking to represent the penurious are on notice that the bankruptcy court, cognizant that dollars paid counsel are dollars denied creditors, has the obligation and authority to deny unreasonable fee applications[35] and to order return of excessive fees paid prior to filing.[36]

### a. Disclosure: Duty and Default.

 Disclosure of counsel's fee arrangements with the debtor is essential to effective exercise of the court's power to pass on fee applications. A debtor's counsel has an affirmative duty punctiliously to disclose *all* its connections with the debtor, including fees paid in the year preceding the bankruptcy filing. 11 U.S.C. § 329(a); B.R. 2016(b). *See, e.g., In re Film Ventures International, Inc.,* 75 B.R. 250, 252 (9th Cir.BAP 1987); *In re Kendavis Industries International, Inc.,* 91 B.R. 742, 759 (Bankr.N.D.Tex.1988); *In re Kero–Sun, Inc.,* 58 B.R. 770, 777–778 (Bankr.D.Conn. 1986).

 Just as counsel seeking approval of employment must come forward with full, candid and complete disclosures to enable parties-in-interest and the court to assess the propriety of employment, *In re Apex Oil Co.,* 128 B.R. 671, 21 B.C.D. 1441, 1443

---

**31.** Aside from abandonment of the principle of economy and the permissibility of interim compensation, the "basic criteria for determining reasonable compensation developed under the [Bankruptcy] Act" apply under the Code. *In re Casco Bay Lines,* 25 B.R. 747, 754 (Bankr. 1st Cir.1982). Rule 2017 substantially restates the substance of its predecessors, which were derived from § 60d of the former Bankruptcy Act. 8 Collier on Bankruptcy, paragraph 2017.02[1] at 2017–2 (15th Ed.1990).

**32.** *See In re Wood,* 210 U.S. 246, 253, 28 S.Ct. 621, 624, 52 L.Ed. 1046 (1908) ("The temptation of a filing debtor [is] to deal too liberally with his property in employing counsel ..."). Congress agreed, and the legislative history of the 1978 Code makes clear its continuing concern that transactions between a debtor and his or her attorney harbor the potential for "evasion of creditor protection provisions of bankruptcy laws" and for "overreaching by the debtor's attorney." H.R.Rep. No. 595, 95th Cong. 1st Sess.

329 (1977), 1978 U.S.Code Cong. & Admin.News 1978, 5787, 6285. *See* 2 Collier on Bankruptcy, paragraph 329.01 at 329–2 (15th Ed.1990). *See also In re Trinsey,* 115 B.R. 828, 835 (Bankr. E.D.Pa.1990) (Chapter 7 debtor's attorney's compensation is "scrutinized more closely" than that of other professionals); *In re Riverview Financial Services, Inc.,* 67 B.R. 714, 715 (Bankr. E.D.Mich.1986) (observing size of fee of "little concern to the debtor because it came from assets which would normally be consumed in distribution").

**33.** *In re Ginji Corp,* 117 B.R. 983, 989 (Bankr. D.Nev.1990).

**34.** *Id.,* citing *In re Consolidated Bancshares, Inc.,* 785 F.2d 1249, 1255 (5th Cir.1986).

**35.** 11 U.S.C. § 330.

**36.** 11 U.S.C. § 329(b).

(Bankr.E.D.Mo.1991); *In re B.E.S. Concrete Products, Inc.*, 93 B.R. 228, 237 (Bankr.E.D.Cal.1988), so must debtor's counsel lay bare all its dealings, antecedent and anticipated, regarding compensation for work "in contemplation of or in connection with" the case. 11 U.S.C. § 329(a). *See In re Flying E Ranch Co.*, 81 B.R. 633, 637 (Bankr.D.Colo.1988). *See also In re Martin*, 817 F.2d 175, 182 (1st Cir.1987) (discussing necessity of full disclosure of arrangements to secure payment of fees to debtor-in-possession's counsel so that the court may intelligently assess conflicts which may give rise to disqualification).

Counsel's fee revelations must be direct and comprehensive. Coy or incomplete disclosures which leave the court to ferret out pertinent information from other sources are not sufficient. *In re Automend, Inc.*, 85 B.R. 173, 178 (Bkrtcy.N.D.Ga.1988). *In re Flying E Ranch Co., supra; In re Michigan General Corp.*, 78 B.R. 479, 482 (Bankr.N.D.Tex.1987).

■ Anything less than the full measure of disclosure leaves counsel at risk that all compensation may be denied. *In re Futuronics Corp.*, 655 F.2d 463 (2d Cir. 1981); *cert. denied* 455 U.S. 941, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982); *In re Arlan's Dept. Stores, Inc.*, 615 F.2d 925 (2nd Cir. 1979). *In re Film Ventures International, Inc.*, 75 B.R. at 252; *In re Kendavis Industries International, Inc.*, 91 B.R. at 759; *In re Devers*, 33 B.R. 793, 799 (D.D.C.1983); *In re Kero–Sun, Inc.*, 58 B.R. at 778; *In re Meyer*, 50 B.R. 3, 4 (Bankr.S.D.Fla.1985); *In re Hawaii General Corp.*, 35 B.R. 789, 792 (Bankr.D.Haw. 1983). The court may exercise its discretion to deny or reduce fees for counsel's failure to disclose its fee arrangements whether or not actual harm accrues to the estate. *In re Futuronics Corp., supra*, 655 F.2d at 471; *In re Devers, supra*. Because it fosters the potential to frustrate meaningful inquiry by the court and others, failure to file the Rule 2016 statement can be, in and of itself, grounds for denying counsel any compensation. *See, e.g., In re Kendavis Industries International*,

*Inc.*, 91 B.R. at 759. Whatever the explanation for disclosure inadequacies, it reflects poorly on responsible counsel; *In re Automend, Inc.*, 85 B.R. at 179; and the resulting potential for frustration of the Code's policy of thorough scrutiny is unacceptable. *In re Devers*, 33 B.R. at 799.

■ Perusing the package proffered and the path pursued by the fee applicant here, the court finds disturbing deficiencies in Skelton, Taintor's statement of compensation paid and work performed.

Skelton, Taintor, never did file a Rule 2016(b) disclosure. Although the firm commenced representing the Saturleys on October 5, 1990 and was paid $10,371.30 between that date and November 6, its fee application represented that its attorneys "were counsel to [the debtors] from November 6, 1990 to February 14, 1991"[37] and made no mention whatsoever of the work performed and fees received before November 6. The application, as supplemented, also failed to divulge the full amount of the firm's retainer. Skelton, Taintor's citation to the pertinent rules belies any claim that its attorneys were unaware of their disclosure obligations when the application was filed.

To condemn these shortcomings is not simply nitpicking. Neither does it represent inflexible insistence that counsel strictly satisfy sterile formalities. Timely, thorough and ingenuous disclosures are essential to implementing the Code's policies protecting the integrity of the bankruptcy process. Recognizing that denial of fees in the face of such shortcomings is discretionary, *In re Anderson*, 936 F.2d 199, 204 (5th Cir.1991); *In re Film Ventures International, Inc., supra*, 75 B.R. at 253, the court observes that winking at disclosure deficiencies of the dimension present here only would serve to misinform. Accordingly, as to all compensation sought for services rendered after November 6, 1990, counsel's application must be denied.

　b.　Reimbursements Requested.

■ In addition to compensation for services, Skelton, Taintor seeks reimburse-

---

**37.** *See supra* n. 10.

ment of expenses incurred while representing the debtors in the period after November 6, 1990.[38] Notwithstanding disallowance of fees for post-November 6 services, the expenses will be considered separately[39] and, to the extent they have been shown to be "actual" and "necessary," reimbursement will be approved. 11 U.S.C. § 330(a)(2).

Total expenses, as listed in the exhibits to the application, add up to $7,092.18.[40] They are categorized as follows:

1. Registry Searches re: real estate holdings:
 a. Androscoggin Title
 Company (ATC) $3,933.75
 b. Wiggin & Nourie 1,393.00
2. Telephone 348.65
3. Photocopies 332.40
4. Postage 15.80
5. Travel 95.50
6. Federal Express 109.00
7. Copies 574.00
8. Materials 40.00
9. Registry of Deeds 16.00
10. Filing Fee 120.00
11. Messenger Service 51.50
12. Fax Service 62.50

■ *Category 1—Title Search Charges.* By far the lion's share of reimbursement sought is for review of real estate records at deed registries throughout Maine and in one New Hampshire county.[41] The difficult question regarding the registry search expense relates not to its amount, but to the underlying necessity for incurring the expense at all.

Mr. Saturley testified that he provided all the records necessary to complete his schedules. Attorney Schau testified that the records were a shambles, that some documents were unavailable and that Mr. Saturley's claims about assets and ownership were confusing and contradictory.

From the testimony of Attorney Schau and of Mr. Saturley, it is apparent that distrust eventually insinuated itself into their relationship. As one of the factors justifying its fee, the firm cites "the difficulties that arose between counsel and debtors."[42] The firm defends its extraordinary registry search expenses by claiming that the work performed benefited the estate because deed research would have been necessary in any event and that, as Saturleys' counsel, it was obligated to ensure the schedules' accuracy. The trustee responds that, although the debtors scheduled their real property interests, the schedules carried no extraordinary warranties of accuracy. He has not received any of the "back-up" work the law firm assembled.

Among a Chapter 7 debtor's responsibilities is filing "a schedule of assets and liabilities...." 11 U.S.C. § 521(1); B.R. 1007(b). The schedules must comply with the official form,[43] B.R. 1007(b)(1), 9009, must be executed, and must be either verified by the debtor or executed as an unsworn declaration under penalty of perjury. B.R. 1008, 9011(b).

■ The Chapter 7 debtor's attorney, although not without obligations regarding the truthfulness and accuracy of documents filed by or on behalf of his client,[44]

---

**38.** The firm received reimbursements for expenses incurred prior to November 6 when its outstanding balances were paid with retainer funds. Those reimbursements are addressed, *infra,* in connection with the pre-November 6 fees.

**39.** The disclosure defaults cited above would justify disapproving the application *in toto.* However, the court has discretion to decide the extent to which payments will be permitted. Given the level of claimed expenses and the justifications proffered, that discretion will be exercised to pass upon the expense claims apart from fees. *Cf. In re Film Ventures International, supra,* (exercise of discretion to permit partial fee allowance).

**40.** This figure differs by several hundred dollars from the amount set forth in the application

itself. The court will, however, rely upon in counsel's itemized figures.

**41.** The work was "contracted out," rather than performed by attorneys or staff of the firm.

**42.** *Post–Hearing Memorandum in Support of Application,* at p. 4.

**43.** At the time of the Saturleys' filing, the schedules were addressed by Revised Official Form 6 (1988), which, like the Rules, was amended, effective August 1, 1991.

**44.** *See, e.g.,* Me.Bar Rule 3.6(c), which provides:
 (c) **Disclosure of Fraud.** A lawyer who receives information clearly establishing that a client has during the representation perpetrated a fraud upon any person or tribunal

is specifically relieved of the requirement that he or she sign, and thereby certify, the debtor's schedules. B.R. 9011(a).

It is the trustee's independent duty, *inter alia*, to investigate a debtor's "financial affairs" and to collect and reduce to money the estate's assets. 11 U.S.C. § 704(1), (4). If a debtor does not prepare and file schedules as the rules require, the court may order that the trustee, or someone else, prepare and file them. B.R. 1007(k). Should the debtor fail to fulfill his or her obligations by knowingly or fraudulently concealing assets, making a false oath or account or withholding documents relating to property in connection with the case, he or she may be denied a discharge, 11 U.S.C. § 727(a)(2), (4), and may be subject to criminal prosecution. 18 U.S.C. §§ 152, 1621. Moreover, should the trustee or another party seek a court order requiring a debtor to file a complete disclosure of all assets, real or personal, and should the debtor refuse to comply, a discharge may be denied, as well. 11 U.S.C. § 727(a)(6).

In investigating the debtor's financial affairs and collecting assets, the trustee and parties-in-interest have opportunity to examine the debtor under oath. 11 U.S.C. § 341; B.R. 2004. In addition, the full range of federal discovery devices is available to parties participating in contested matters or adversary proceedings. *See* B.R. 7026, 9014.

 Thus, although a debtor's attorney may not turn a blind eye to fraud,[45]

neither is he or she a guarantor of the accuracy of the client's schedules. A diligent and thorough effort to assist the debtor in assembling, presenting, and filing required data is part of counsel's job. However, expending large sums of money to test and re-test the accuracy and completeness of the information furnished by the client is waste. A debtor is obligated to disclose comprehensively his assets. Other parties may employ coercive process to require it.

 If, after informing a bankruptcy client of the seriousness of disclosure obligations and of the consequences attending default, an attorney has unshakable concerns about the client's candor, a number of options are available. If the case has not yet been initiated, the attorney may terminate the relationship. Me.Bar R. 3.5(c). If the case must be filed or has been filed, the attorney should alert the trustee that, notwithstanding the debtor's best efforts, the schedules are incomplete so that the trustee may then investigate as appropriate. Again, withdrawal may be the appropriate step *Id. See* Me.Bankr.R. 9010(c). In the worst case, when the attorney is convinced a fraud has occurred, he or she had best follow appropriate provisions of the applicable code of conduct.[46]

Thus, incurring $5,326.75 for pre-filing deed research in this case was unnecessary and wasteful.[47] Accepting that this was

---

shall promptly call upon the client to rectify the same; and if the client refuses or is unable to do so, the lawyer shall reveal the fraud to the affected person or tribunal, except when the information is protected as a privileged communication. If a person other than a client has perpetrated a fraud upon a tribunal, the lawyer shall promptly reveal the fraud to the tribunal.

*See, also,* Model Rules of Professional Conduct Rules 1.2(d); 3.3(a)(2), (4); 8.4(c); Model Code of Professional Responsibility DR 1–102(A)(4).

**45.** *E.g.,* Me.Bar Rule 3.6(c), *supra* n. 44.

**46.** *Id.*

**47.** Alternatively, it appears that the sums sought for real estate research expenses are excessive. ATC's itemized billing report shows that its work began on January 8 and continued through January 17, 1991. Thus, the registry

work commenced more than 90 days after Mr. Saturley first consulted with Attorney Abbott in contemplation of bankruptcy. The delay, viewed in relation to Mr. Saturley's extreme circumstances in October 1990 and the inevitability of a filing as of November 6, renders unconvincing any contention that emergent circumstances justified extraordinary expenses.

Commencing January 5, 1991, one of the firm's paralegals began reviewing and listing the Saturleys' real estate assets from the records the clients provided. That work continued through the period when ATC was put to work. On January 24, the paralegal spent one hour revising her list of real estate assets based on the registry search work of ATC. Overall, over 35 hours of firm paralegal time was devoted to review and listing real estate assets, over and above the extramural title searches for which reimbursement is sought. Thus, the conclusion

not a simple matter, that the debtors' records were in disarray, and recognizing that out-of-state property was involved, the total sum of $1,000.00 will be allowed for reasonable, if extraordinary, expenses relating to investigation of the Saturleys' real property interests.

■ *Categories 3, 5, 6, 7, 8, 9, 11 and 12.* Expenses for these categories are simply summarized in the application and accompanying bills. Counsel's affidavits[48] and testimony do nothing to illuminate the application.

Counsel may be reimbursed for a variety of expenses, when demonstrated to be "actual and necessary." 11 U.S.C. § 330(a)(2). *See In re American International Airways, Inc.,* 47 B.R. 716, 725 (Bankr.E.D.Pa. 1985). However, the required showing "cannot be accomplished merely by listing in the fee application the amount of the expenditure next to the type of expenditure." *Id.* Without explanation or detail concerning the nature of the expenses or how they relate to the bankruptcy case, the applicant cannot sustain its burden. *See In re Metro Transp. Co.,* 107 B.R. 50, 55 (E.D.Pa.1989).

In a case such as this one, where extraordinarily high reimbursements are sought, more information is required.[49] The claimed reimbursements for photocopies, travel, express mail, copies, materials, registry charges, messenger service and facsimile transmission are disallowed in full. To authorize reimbursement without evidence of need and reasonableness of the charges would be improper.[50]

■ *Category 2—Telephone.* Counsel's itemized bills reflect numerous long distance telephone calls. The affidavits and itemization demonstrate that extensive telephone work was required in dealing with both clients and creditors. The $348.65 reimbursement sought is not unreasonable and will be allowed.

*Category 4—Postage.* The record reflects extensive correspondence to clients and creditors. The $15.80 postage expense reimbursement is reasonable and will be allowed in full.

*Category 10—Filing Fee.* The $120.00 bankruptcy filing fee is properly reimbursable.

### 4. Pre–November 6 Fees and Expenses.

■ Finally, the court will examine the fees and expenses that accrued between October 5 and November 6, 1990. A total of $10,371.30 has been paid to the firm on their account.[51] The standard applied under § 329(b) to gauge "excessiveness" of fees received is in substance the same as that employed to measure "reasonableness" of fees sought under § 330. *In re Rheuban,* 121 B.R. 368, 383 (Bankr. C.D.Cal.1990), *rev'd on other grounds* 124 B.R. 301 (C.D.Cal.1990).

#### a. Fees.

■ Any review of fees paid prior to bankruptcy must be informed by an awareness of the circumstances as they existed at the time the services were rendered. Because counsel was engaged in pursuing alternatives to a bankruptcy filing up to

---

that there was considerable duplication of effort is inescapable.

**48.** At the close of the evidentiary hearing, the applicants were afforded yet another opportunity to explain the entries on their bills. Attorneys Abbott and Schau each did so. Affidavit of Charles H. Abbott, Esq., dated May 28, 1991; Affidavit of June Z. Schau, Esq., dated June 3, 1991.

**49.** The itemization itself raises unanswered questions. For example the differences between "copies" and "photocopies," the per page charge for each, and even the general need giving rise to the expenses are not apparent.

The nature of "materials" used and the need to employ express mail service, messenger service and facsimile transmission are unfathomable.

The level of reimbursements sought for photocopies, copies, and express mail service is exceptionally high for a Chapter 7 case, therefore requiring more in the way of supporting explanation than might be necessary in other circumstances.

**50.** *See, e.g., In re Hobbs,* 108 B.R. 93, 94 (Bankr. D.Md.1989) (express mail charges disallowed absent showing of need). *See, also, In re Seneca Oil Co.,* 65 B.R. 902, 913 (Bankr.W.D.Okla.1986).

**51.** *See supra* n. 18 and accompanying text.

November 6, the scope of activities within the bounds of reasonableness is wider than it would have been if the then existing circumstances precluded all possibilities but a Chapter 7. *Cf. In re Leff,* 88 B.R. 105 (Bankr.N.D.Tex.1988) (articulating scope of Chapter 7 debtor's counsel's duties); *In re Riverview Financial Services, Inc.,* 67 B.R. 714, 716 (Bankr.E.D.Mich. 1986). However, futile efforts aimed at achieving unattainable objectives are unreasonable. Fees generated in tilting at windmills will be disallowed. *See, e.g., In re Amstar Ambulance Service, Inc.,* 120 B.R. 391, 396 (Bankr.N.D.W.Va.1990) (fees for reorganization work in period after likelihood of reorganization has ceased to exist denied); *In re Alderson,* 114 B.R. 672, 681 (Bankr.D.S.D.1990) (fees generated after attorney should have known conversion was foregone conclusion denied). Moreover, if the application does not reflect "billing judgment," as the "actual, necessary" requirement of § 330 implicitly dictates, the court will deny that compensation unreasonably requested.[52] *In re Leonard Jed,* 118 B.R. 339, 347 (Bankr. D.Md.1990); *In re Metro Transp. Co.,* 107 B.R. 50, 52 (E.D.Pa.1989).

First Circuit precedent embraces the lodestar approach to fee computations both within and without the bankruptcy context. *See Furtado v. Bishop,* 635 F.2d 915 (1st Cir.1980); *Boston & Maine Corp. v. Moore,* 776 F.2d 2 (1st Cir.1985); *In re Spillane,* 884 F.2d 642 (1st Cir.1989) *In re Casco Bay Lines,* 25 B.R. 747 (Bankr. 1st Cir.1982); *In re Thomas, Inc.,* 43 B.R. 510 (Bankr.D.Mass.1984); *In re Malden Mills, Inc.,* 42 B.R. 476 (Bankr.D.Mass.1984).

■ Applying the lodestar method whereby the court derives a reasonable hourly rate and the number of hours reasonably expended, necessarily entails subjective evaluation of counsel's efforts. *In re Casco Bay Lines, Inc., supra,* 25 B.R. at 755. The course to the lodestar is marked by some, if not all, of the factors first discussed in *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir.1974). *See In re Casco Bay Lines, Inc., supra,* 25 B.R. at 754–55.[53]

■ From October 5 through November 6, 1990, Attorney Abbott expended 65.3 hours on the file at his usual rate of $140.00 per hour. Attorney Abbott has been practicing law since 1963. He has extensive experience as a commercial litigator. Less recently, he acquired some experience in bankruptcy matters. Attorney Abbott is a senior member of the Maine bar and has an excellent reputation in the legal community. In accepting the Saturleys as clients, he was undertaking a case involving a relatively complex web of personal assets, business activities and closely held corporations. The debtors were financially *in extremis* and, at first, their plight de-

---

**52.** Failure to exercise billing judgment has led to a denial of fees altogether in some cases. *See In re Ginji Corp.,* 117 B.R. 983, 988 (Bankr. D.Nev.1990); *In re Great Sweats, Inc.,* 113 B.R. 240, 243 (Bankr.E.D.Va.1990). "Billing judgment" has been described as making "a good faith effort to exclude from a fee request hours that are excessive, redundant or otherwise unnecessary." *In re Metro Transp. Co., supra,* 107 B.R. at 52. It is nothing more than the judgment attorneys regularly exercise when they edit their bills before invoicing private clients. *Id.; See In re Temple Retirement Community, Inc.,* 97 B.R. 333, 339 (Bankr.W.D.Tex.1989).

**53.** The factors taken into account in fixing the rate include the customary hourly fee, the level of skill necessary to perform the services, whether the fee is fixed or contingent; time limitations; the amount to be obtained; the attorneys' reputation; and the undesirability of the case. *Id.* In setting reasonably expended hours, the court should consider the time and labor required from the perspective of the novelty and difficulty of the question presented, the opposition encountered, the amount at stake and the need to eliminate duplicative hours. *Id.; M. Berenson Co. & Faneuil Hall Marketplace,* 671 F.Supp. 819, 830–31 (D.Mass.1987). In the bankruptcy context, rather than considering "success" achieved, "benefit" to the estate is more appropriately weighed. *In re Casco Bay Lines, Inc.,* 25 B.R. at 755. Here, however, in considering the pre-November 6 services, success achieved is an appropriate guide because, as noted above, the unavoidable necessity of bankruptcy was manifest after that date. Finally, after computing the lodestar fee, the court must consider whether an upward or downward adjustment is warranted based on the "quality of representation." *Id.* at 756. The court finds no such departure warranted here and, therefore, discusses that aspect of the analysis no further.

manded quick familiarization with their affairs and difficult bargaining with creditors. His fee was well-secured by retainers paid, but the immediate demands of the case may have made it somewhat undesirable. In light of these facts, $140.00 per hour is the appropriate lodestar hourly rate.

During the time period in question, Attorney Abbott traveled to Portland ten times to meet with his clients, with opposing counsel, and with counsel for the Saturleys' corporations. The purposes of the trips were to familiarize himself with the Saturley's affairs, to attempt to negotiate a solution short of bankruptcy and to explain the legal import of possible courses of action to his clients. Travel was necessitated by the need to meet face-to-face with opposing counsel and to view first hand the debtors' business operations and records. However, travel and conferences consumed 50.4 hours of Attorney Abbott's time. The time entries do not separate travel time from conference time. Based on the distances involved, however, approximately one and one-half hours can be allotted to travel for each trip. Unconvinced that each trip was necessary, concerned that counsel billed his full hourly rate for travel time, and aware that repeated attempts to negotiate with Casco came to naught, the court reduces to 30 the number of hours reasonably expended on interviews and settlement conferences.

Of the balance of 14.9 hours of Attorney Abbott's time, the bulk is attributable to telephone conversations with the Saturleys, with bank counsel, with creditors and with other counsel. The figure includes one hour of legal research on unspecified aspects of federal law. Given the existing circumstances and the rapid pace of events, and taking into account that positive results were not achieved, 10.0 hours is a reasonable time expenditure for such efforts. Thus, the lodestar figure for Attorney Abbott for the period October 5 through November 6, 1990 is 40 hours at $140.00 per hour, or $5,600.00.

During the October 5 to November 6 period, Attorney Schau worked 4.6 hours on the file, billing at her usual rate of $100.00 per hour. As an attorney with five years experience who generally does bankruptcy work, and in light of the other pertinent factors discussed above, $100.00 is an appropriate lodestar rate for her services. Her time was spent primarily researching tax liability issues. Attorney Schau attributed 1.8 hours to a conference with the Saturleys and Attorney Abbott, and approximately .7 hours in other intra-office conferences. Taking into account the appropriate factors, including the need to eliminate duplication of effort and unnecessary intra-office conference, the lodestar hour figure for Attorney Schau will be set at 4.0 hours.

Finally, a first year associate, Theresa E. Yannan, Esq., spent 3.5 hours on the file, designating her work as "research bankruptcy issues" and "research statute." Without regard to the hourly rate charged, there is no evidence that Attorney Yannan had further involvement in the case or that she even reported the results of her vaguely defined research to Attorneys Abbott or Schau. Therefore, no compensation for her time will be approved.

### b. Expenses.

Counsel's submissions include no detail whatsoever for expenses reimbursed out of the Saturleys' retainer on or before November 6, 1990. Subtracting the fee component from the total payment, it appears that $238.70 was allocated to expenses. They are disallowed.

### CONCLUSION

For the reasons set forth above, the cash collateral motion is denied. Skelton, Taintor's pre-November 6 1990 fees will be allowed in the amount of $6,000.00. Compensation for services rendered after November 6, 1990, is disallowed. A total reimbursement for expenses in the amount of $1,484.85 is approved. In light of the $10,371.70 paid to the firm on or before November 6, 1990, $2,886.85 must be paid over to the trustee. Remaining retainer funds, in

the amount of $26,009.42, must be returned to the trustee, subject, for now, to the Casco lien.

A separate order will be issued by the court and entered on the docket forthwith.