## In re PALUMBO FAMILY LIMITED PARTNERSHIP, Debtor,

### and

### P.M. Palumbo, Jr., Debtor.

### Bankruptcy Nos. 91–11364–AB, 92–15214–AB.

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

April 3, 1995.

452

Benjamin C. Ackerly, Hunton & Williams, Richmond, VA, for Akin Gump.

Stanley J. Samorajczyk, Linda S. Broyhill, Akin, Gump, Strauss, Hauer & Feld, L.L.P.

William Daniel Sullivan, Collier, Shannon, Rill & Scott, Washington, DC, Thomas P. Gorman, Tyler, Bartl, Burke & Albert, Alexandria, VA, for the Partnership.

Denise A.G. Erickson, Office of U.S. Trustee, Alexandria, VA, for U.S. Trustee.

*MEMORANDUM OPINION*

MARTIN V.B. BOSTETTER, Jr., Chief Judge.

Palumbo Family Limited Partnership (the "Partnership"), a debtor in this consolidated bankruptcy case, alleges wrongdoing on the part of its former attorney, Stanley J. Samorajczyk, and his law firm, Akin, Gump, Strauss, Hauer, and Feld, L.L.P. ("Akin Gump"). The dispute arose when Akin Gump filed an application to recover fees and expenses from the estate, and then withdrew as counsel from the Partnership's case. The Partnership objected to the fee application, arguing, among other things, that Akin

Gump violated an order of this Court when it drew on a retainer and other funds contained in a client-trust account without first obtaining court approval. Subsequently, the Partnership moved to impose sanctions against Akin Gump. After several hearings on Akin Gump's fee application, we decided to award fees and expenses, but directed Akin Gump to deposit the award into the registry of this Court pending the outcome of the Partnership's motion for sanctions. Akin Gump made the deposit, and then moved to dismiss the sanctions motion. After hearing argument on the motion to dismiss, because of the somewhat complex issues involved, we took the matter under advisement.

Based on the evidence adduced at three hearings and on the authorities cited by the Partnership, we conclude that the Partnership's position falls short in several respects for the reasons stated below. We therefore find that the additional discovery and hearings requested by the Partnership are unnecessary, and that the sanctions sought by the Partnership are unwarranted. Although we grant Akin Gump's motion to dismiss, and accordingly dismiss the Partnership's motion for sanctions, we admonish Akin Gump not to permit this type of situation to occur again, and we will require the filing of a report specifying the corrective measures Akin Gump has taken to prevent similar occurrences. Pursuant thereto, we make the following findings and conclusions.

## I.

P.M. Palumbo, Jr.,[1] the Partnership's general partner, is a physician specializing in orthopedic surgery, and he practices medicine in both Florida and Virginia. In addition to his medical practice, Palumbo has accumulated numerous interests in real estate. At one point in time, he held two undeveloped parcels of land located in Fairfax County, Virginia, each designated respectively as the "Germain–Wong" property and the "Buck–Mar" property.

Palumbo's journey toward bankruptcy began with bitter litigation involving himself and Sovran Bank, N.A. (the "Bank").[2] Starting in 1988, the Bank made two loans to Palumbo and took back two deeds of trust, one encumbering the Germain–Wong property, the other the Buck–Mar property. For reasons not relevant here, the business relationship between the Bank and Palumbo soured. In October 1990, the Bank determined that Palumbo had defaulted on both loans, and it eventually issued a notice of foreclosure, scheduling a sale of the Germain–Wong property for April 8, 1991.

Between October 1990 and April 1991, the Bank and Palumbo entered into a series of lengthy, albeit unsuccessful, negotiations in an effort to settle their dispute. On Friday, April 5, 1991, the Bank informed Palumbo that it had rejected all settlement offers and that it intended to proceed to foreclosure on Monday, April 8, 1991. The Bank also informed Palumbo that, at the foreclosure sale, it would bid in less than half of the loan balance. To avoid foreclosure and the possibility of a multi-million dollar deficiency claim, Palumbo's attorneys prepared, over the course of a single weekend, documents that created the Partnership and conveyed Germain–Wong and Buck–Mar to the Partnership. Assisted by cellular phones, Palumbo's attorneys recorded the documents within an hour on Monday morning, April 8th, and the newly-created Partnership immediately petitioned for Chapter 11 relief, thereby invoking the automatic stay. *See* 11 U.S.C. § 362(a).

With respect to the Partnership itself, Palumbo is both a general and limited partner, owning a 97% partnership interest. Palumbo's wife is a limited partner who owns the remaining 3% interest. As of the petition date, the Partnership had no employees or

---

**1.** Although we conclude, in part II.A, *infra*, that Palumbo and the Partnership are one and the same, the procedural posture of this case dictates that we refer to them as separate entities.

**2.** During the course of this Chapter 11 case, NationsBank of Virginia, N.A., became the successor-in-interest to Sovran Bank, and thus acquired the Palumbo loans. Shortly after NationsBank entered into a settlement agreement with Palumbo and the Partnership in November 1992, NationsBank transferred its claims to Potomac Equity Portfolio Limited Partnership. For purposes of brevity, we will refer to these successor entities collectively as the "Bank."

unsecured creditors. The only assets it held were the Germain–Wong and Buck–Mar properties. The Bank was a "creditor" insofar as it held the liens encumbering these two tracts of land. It is important to note that it was Palumbo himself who executed the notes, and remained personally liable to the Bank. The Partnership never assumed those obligations.

On the same day the Partnership filed for bankruptcy, Palumbo instituted a lender-liability suit against the Bank in the Circuit Court of Fairfax County, Virginia. After Palumbo amended his complaint in January 1992, the Bank filed a cross-bill against Palumbo to recover $20 million on the notes, and then moved for summary judgment on the cross-bill. Although Samorajczyk was not representing the Partnership at this point, he did testify at the fee-application hearings that there was a "significant risk" that the state court would have granted summary judgment to the Bank. In January 1992, this Court lifted the automatic stay with respect to the Germain–Wong parcel, which enabled the Bank to foreclose upon it. (Earlier, the Bank withdrew its lift-stay motion with respect to Buck–Mar, apparently conceding that the Partnership had equity in the property). The Bank did foreclose on the Germain–Wong property and then asserted a deficiency claim. At this juncture, Palumbo brought Akin Gump into the case.

### A.

Palumbo met with Samorajczyk in early April 1992 to explore the possibility of retaining Akin Gump. This was not the first time Palumbo had sought to retain Samorajczyk as counsel. Six months earlier, Samorajczyk was a partner with the firm of Hazel & Thomas, and Palumbo approached him to see whether he would help him in the legal battle against the Bank. Samorajczyk declined be-

cause Hazel & Thomas had represented the Bank in other matters, and accordingly wanted to avoid the potential conflict of interest. When Samorajczyk moved to Akin Gump, Palumbo contacted him again.

At the April 1992 meeting, Palumbo expressed that he was not pleased with the progress of the Partnership's bankruptcy, and that he wanted to hire Samorajczyk in an effort to settle the dispute with the Bank. Samorajczyk reviewed the situation with Palumbo, and asked whether anyone had advised Palumbo to propose a "Sandy Ridge" reorganization plan. Samorajczyk was referring to *Sandy Ridge Development Corp. v. Louisiana National Bank (In re Sandy Ridge Development Corp.)*, 881 F.2d 1346 (5th Cir.1989) in which the Court of Appeals for the Fifth Circuit held that a plan was fair and equitable when it proposed to give the mortgaged premises to the lender in full satisfaction of the lender's secured claim. At the fee-application hearings, Samorajczyk testified that he raised the *Sandy Ridge* plan only as a possible course of action, and that he cautioned Palumbo that such a plan was "not a sure thing" because the circumstances in Palumbo's case were not identical to the facts in *Sandy Ridge* and because the prospect of implementing such a plan depended on the value of Buck–Mar. In contrast to Samorajczyk's testimony, Palumbo testified that, at the April meeting, Samorajczyk suggested that implementing a *Sandy Ridge* plan was the answer to the Partnership's problems. According to Palumbo's administrative assistant, who was present at the meeting, Samorajczyk explained that a *Sandy Ridge* plan would force the Bank to "eat dirt" and "write [Palumbo] a check," while enabling Samorajczyk to "make new law" in the process.[3]

---

**3.** Tr. of June 21, at 116. Samorajczyk denies using these words at the initial client meeting. Tr. of May 18, at 90. Nevertheless, he indicated that he used the phrase "eat dirt" to express the *Sandy Ridge* concept in his negotiations with the Bank. Tr. of Aug. 18, at 62; *see also* Ex.D. As indicated above, the phrase "eat dirt" signifies the transfer of Buck–Mar to the Bank in satisfaction of the Bank's secured claim. If the value of Buck–Mar was high enough, the transfer would

have satisfied the balance owed on the Buck–Mar loan and would have offset the deficiency claim that arose from the foreclosure sale of Germain–Wong. After extinguishing these debts, the Bank would have returned any surplus amount to Palumbo, and thus would have "written him a check." Thus, the whole possibility of forcing the Bank to "eat dirt" and "write a check" hinged on the value of Buck–Mar.

Although Samorajczyk agreed to represent the Partnership, there is conflicting testimony concerning the role Samorajczyk was to assume in Palumbo's individual bankruptcy case. Palumbo testified that, at the April meeting, he informed Samorajczyk that he intended to file his own personal bankruptcy petition in Florida and that he had decided to retain Chad Pugatch, a sole practitioner there, to handle his individual case. Palumbo thus wanted Samorajczyk to handle the Partnership's case and to negotiate a settlement with the Bank. In contrast, Samorajczyk asserts that Palumbo asked him to quarterback both Palumbo's case and the Partnership's case. Samorajczyk testified further that he and Palumbo had a "candid discussion" on how Palumbo's problems and the Partnership's problems were really one and the same, given that Palumbo was personally liable to the Bank. Samorajczyk said that he saw no reason for entering an appearance in the Florida case because, in his view, Pugatch was competent in bankruptcy matters and Palumbo had asked him to coordinate with Pugatch. Palumbo flatly denies that he ever asked Samorajczyk to quarterback the two cases. Based on the testimony and the demeanor of the witnesses, we find that Palumbo did, in fact, ask Samorajczyk to quarterback these cases.

On April 15, 1992, Palumbo's accountant wire-transferred a $75,000 retainer to an escrow account held by Akin Gump. Immediately thereafter, Palumbo filed his Chapter 11 petition in the United States Bankruptcy Court for the Southern District of Florida. The statement of financial affairs filed in Palumbo's case disclosed the $75,000 transferred to Akin Gump. After Palumbo commenced his case, the bankruptcy court in Florida approved the employment of Chad Pugatch as his counsel. Subsequently, the Bank asserted a claim against Palumbo's bankruptcy estate for $14,090,844, the sum representing the deficiency claim on the Germain–Wong loan and the balance claimed on the Buck–Mar loan. The Bank also filed a complaint against Palumbo to determine the nondischargeability of its claim, and objected to the exemptions claimed by Palumbo.

During May and June of 1992, Akin Gump researched whether the $75,000 retainer and a guaranty made by Palumbo to pay the Partnership's legal bills would create a conflict of interest. After reviewing some relevant caselaw, an Akin Gump associate prepared an internal office memorandum suggesting that a conflict of interest would arise. Samorajczyk disagreed with the memo's analysis, concluding that there would be no conflict because Palumbo controlled the Partnership and was personally liable on the obligations to the Bank.

In June 1992, Palumbo—on behalf of himself and the Partnership—endorsed a letter that outlined the terms governing Akin Gump's representation of the Partnership. The letter acknowledged that Palumbo, as general partner of the Partnership, had paid Akin Gump a retainer of $75,000. It also disclosed that Akin Gump would charge its fees and expenses against the retainer and, once the retainer was exhausted, Akin Gump would require further retainers, as it deemed necessary, to continue representing the Partnership.[4] Under the terms of this letter, Palumbo agreed to guarantee the payment of retainers and legal bills "due and owing from [Akin Gump's] representation of the Palumbo Family Limited Partnership...."[5] Finally, the parties agreed that the Partnership would be billed on a monthly basis and that each bill would be "due within 30 days after receipt."[6]

Thereafter, the Partnership sought authority from this Court to substitute Akin Gump for its then-current counsel. Accompanying the Partnership's request was an affidavit signed by Samorajczyk that disclosed Akin Gump's receipt of a $75,000 retainer and Palumbo's promise to guarantee the payment

---

**4.** Some may point out that the agreement reached between Palumbo and the Partnership did not involve a true "retainer," but rather a payment designed to secure the future payment of legal fees. *See In re Dees Logging, Inc.,* 158 B.R. 302, 306 (Bankr.S.D.Ga.1993). We will continue, however, to refer to the $75,000 as a "retainer" because the parties in this instance have done so.

**5.** Ex. # 1.

**6.** *Id.*

of fees and expenses billed to the Partnership. The affidavit did not disclose, however, that Palumbo had filed his own bankruptcy petition. The Office of the United States Trustee objected to the Partnership's request on several grounds. First, it opposed the payment of the Partnership's legal bills on a monthly basis, arguing that the Partnership could not make such payments without prior approval of this Court. Second, it asserted that the $75,000 transferred to Akin Gump was not a "retainer," but a prepayment for legal services to be rendered by Akin Gump. Thus, Akin Gump could not receive this sum of money before the Court approved its fees. Finally, the United States Trustee indicated that Akin Gump should deposit the $75,000 in an interest-bearing account until the Court permitted Akin Gump to withdraw it.

Samorajczyk deposited the $75,000 in an interest-bearing account, and agreed to comply with the other demands outlined in the United States Trustee's objection. The United States Trustee subsequently withdrew its objection and, on August 4, 1992, this Court signed an order approving the Partnership's request to employ Akin Gump as its legal counsel. For purposes of clarity, we will refer to this order as the "August 4th Order." The August 4th Order included specific language as to how the $75,000 retainer would be disbursed; the order provided expressly that "all disbursements from the retainer account, all hourly rates of attorneys and paralegals and all costs *are subject to prior approval of this Court....*" [7]

It is undisputed that Akin Gump violated the order when it drew on the retainer without first seeking court approval. The parties, however, disagree as to whether Akin Gump *intended* to violate the order. Akin Gump alleges that the violation was inadvertent. During the course of the Partnership's bankruptcy, Akin Gump had been sending its legal bills directly to Palumbo on a monthly basis. According to Akin Gump, Palumbo had alerted Samorajczyk to the fact that the Partnership's legal bills did not reflect the $75,000 retainer. To accommodate Palumbo, Samorajczyk asked Akin Gump's billing department to show the retainer on all future Partnership bills. At the fee-application hearings, Samorajczyk testified that, at his old firm of Hazel & Thomas, the bills would credit the retainer without actually drawing against it. The same procedure did not exist at Akin Gump. Each time Akin Gump sent its monthly bills to Palumbo, it withdrew a portion of the retainer. By December 31, 1992, the retainer was exhausted. Samorajczyk asserts that he did not know Akin Gump had actually drawn on the retainer until some time later. He further testified that, once he discovered that his firm was actually drawing on the retainer, he "put a stop to it." [8]

Akin Gump also drew on the sum of $1,200, which had been deposited in the same escrow account holding the retainer. According to Akin Gump, the $1,200 was originally paid to retain a real-estate appraiser who initially agreed to estimate the value of Buck–Mar. The appraiser subsequently decided that he was unable or did not want to work for Palumbo, and thus the $1,200 was refunded and deposited in the escrow account. Although Akin Gump characterizes these withdrawals as inadvertent, the Partnership alleges that the withdrawals were intentional, and it further asserts that this alleged intent relates to the following events that occurred during the balance of the case.

During the summer of 1992, Akin Gump researched numerous issues that related directly to Palumbo's individual case pending in Florida. For instance, it researched issues concerning the assets within Palumbo's bankruptcy estate and the exemptions claimed by him. It also researched issues pertaining to the nondischargeability complaint filed by the Bank, and the impact of certain prepetition transfers made by Palumbo. Finally, Akin Gump performed work relating to a motion filed by the Bank to transfer Palumbo's case to the Eastern District of Virginia. According to Samorajczyk, Palumbo had asked Akin Gump to conduct this work even though Akin Gump had not entered an appearance in Palumbo's individual case. Thus, Chad Pugatch represented

---

7. Ex. #3 (emphasis added).

8. Tr. of May 18, at 85.

Palumbo in Florida while Akin Gump assisted Pugatch in that representation.

Also, in June 1992, Akin Gump started to realize that a *Sandy Ridge* plan was not feasible. According to Samorajczyk, an initial appraisal of the Buck–Mar property indicated that it was worth less than what Palumbo originally estimated. This meant that, if the Bank received the property in satisfaction of its *secured* claim, an unsecured deficiency claim would have remained. *See* 11 U.S.C. § 506(a). Samorajczyk concluded that it would have been "very difficult, if not impossible," to confirm a plan that left the Bank with a deficiency claim while Palumbo himself remained solvent.[9] In Akin Gump's view, the Bank would have been an impaired creditor under such a plan. Additionally, there were no other claims asserted against the Partnership, so if the Bank objected to the Partnership's plan, there would have been no other impaired creditors available to accept the plan, which would have prevented the Partnership from using the so-called "cram down" provisions in order to achieve confirmation. *See* 11 U.S.C. § 1129(a)(10) & (b)(1). By August 5, 1992, Akin Gump had informed Palumbo that a *Sandy Ridge* plan was no longer a possibility.

Palumbo then addressed a letter to Samorajczyk, explaining that he was "shocked," "disappointed" and "confused" about the fact that a *Sandy Ridge* plan could not be implemented.[10] This letter was motivated by statements Samorajczyk made at an August meeting, informing Palumbo that a *Sandy Ridge* plan was no longer possible since Palumbo was solvent. Palumbo said he was surprised by the turn of events because both he and his former counsel had told Samorajczyk, at the outset, that Palumbo was solvent. Even though, in Palumbo's view, Samorajczyk was aware of Palumbo's financial condition, Akin Gump still expended an inordinate amount of time and money researching Palumbo's net worth and the *Sandy Ridge* concept, only to conclude that a *Sandy Ridge* plan was no longer feasible. Without the possibility of forcing the Bank to "eat dirt," Akin Gump had to find an alternate approach

for resolving the dispute with the Bank, which was a prospect Palumbo hardly relished because he wanted to give only Buck–Mar to the Bank—nothing more.

The alternate approach favored by Akin Gump was to reach a settlement with the Bank. This approach was hardly "new" insofar as Palumbo had originally contemplated that Akin Gump would pursue settlement discussions. In June 1992, at approximately the time Akin Gump started to have doubts concerning the *Sandy Ridge* plan, Samorajczyk approached one of the Bank's lawyers to discuss the possibility of reopening settlement negotiations. In September 1992, Akin Gump worked on a settlement proposal, and met with the Bank's attorneys to resolve the dispute. These settlement discussions continued into October 1992.

As an initial bargaining tactic, Akin Gump indicated that it would seek to consolidate substantively the bankruptcy estates of Palumbo and the Partnership. According to Samorajczyk, the purpose of consolidation was to diminish the Bank's ability to veto a reorganization plan proposed by the Partnership. If the two estates were consolidated, both Palumbo and the Partnership could propose a joint plan of reorganization. If the Bank objected to the joint plan, Akin Gump could enlist the acceptance of other creditors to win confirmation. For this same reason, the Bank vigorously opposed substantive consolidation.

At one point during the negotiations, Akin Gump proposed that it would consent to the transfer of Palumbo's case to the Eastern District of Virginia if the Bank agreed, in exchange, to consolidate the two bankruptcy estates. The Bank rejected the offer because, again, it believed that consolidation would diminish its power to veto a plan proposed by the Partnership. Notwithstanding that rejection, the Bank's motion to transfer Palumbo's case was granted by consent order entered October 5, 1992. Palumbo's case was then transferred to this Court.

In November 1992, the Bank, Palumbo, and the Partnership entered into a settle-

---

**9.** Tr. of May 18, at 95.

**10.** Ex.D.

ment agreement resolving their dispute. As part of the settlement, the Bank agreed to dismiss, with prejudice, its nondischargeability complaint against Palumbo. It also agreed to dismiss its objections to Palumbo's claims of exemptions, which effectively shielded from creditor reach the $3 million held in a retirement account and his $1.5 million residence. Additionally, the parties agreed to dismiss the litigation commenced in Fairfax County circuit court, which included the Bank's cross-bill for $20 million. The settlement allowed the Bank to foreclose on Buck–Mar, the Partnership's sole remaining asset, without further recourse against Palumbo and the Partnership. It further provided that the Bank would receive two tracts of land from Palumbo and from a non-debtor partnership controlled by him. Finally, the settlement released the Partnership from any liability on the Germain–Wong loan, and it transformed the Bank's $7.8 million unsecured deficiency claim into a $2.2 million secured claim, which meant that the Bank forgave approximately $5.6 million worth of debt.

Initially, the Bank wanted the settlement approved before plan confirmation. Palumbo, on the other hand, wanted the settlement approved in conjunction with plan confirmation. Samorajczyk testified that, if the settlement had been approved outside the confirmation process, Palumbo would have faced a significant tax liability resulting from the forgiveness of debt. Alternatively, if the settlement was approved as part of plan confirmation, it would have been subject to the Bankruptcy Tax Act, which would have reduced, if not eliminated, the adverse tax consequences Palumbo would have otherwise faced. Additionally, the foreclosure sale of Germain–Wong had already produced a taxable gain for Palumbo in 1992, so Palumbo's tax advisors were urging him to push other taxable events into 1993.[11] The Bank, however, was unwilling to become involved in the confirmation process, given its prior experience in dealing with Palumbo. As a compromise, Akin Gump and the Bank agreed to

implement the settlement in four separate stages, the first stage involving the dismissals of the state-court litigation, the nondischargeability complaint, and the objection to the claims of exemptions. Structuring the settlement this way gave Palumbo a tax savings of $1 million.[12]

After the parties entered into the settlement agreement, Samorajczyk met with Palumbo to determine a strategy for negotiating with the remaining creditors. At the end of the meeting, Samorajczyk observed that the retainer was nearly exhausted, and he asked Palumbo to replenish it. According to one of Palumbo's assistants present at the meeting, Palumbo became distressed over where he could get the money to replenish the retainer. Samorajczyk advised Palumbo to look to sources outside his bankruptcy estate, such as his retirement account or one of his non-debtor limited partnerships, to obtain the funds.

Also, at this meeting, Palumbo expressed concern about the legal fees charged by Akin Gump. Palumbo complained that (1) several charges were inflated, (2) he never authorized certain expenses incurred by Akin Gump, and (3) he could not determine the reasonableness of individual tasks because they were grouped together with other projects listed in the bills. Samorajczyk replied that he was not prepared to make any adjustments in the bills at that moment, but he offered to discuss the matter further if Palumbo identified specific line items in the bills that were erroneous.

Palumbo made additional complaints to Samorajczyk in a letter dated December 13, 1992. In that letter, Palumbo expressed that it "might be best to take an overall view of the bill and adjust it generally rather than trying to analyze each charge." [13] Palumbo reiterated his concern that the time charged for various tasks was "greatly excessive in many areas." [14] In addition, he objected to the large number of Akin Gump attorneys that had become involved in the case, and the

---

**11.** Tr. of May 18, at 35–37.

**12.** *Id.* at 37; Tr. of June 21, at 212, 215; Tr. of Aug. 18, at 7; Ex. # 4.

**13.** Ex. I, at 1.

**14.** *Id.* at 2.

amount of time charged for "researching." [15] Finally, Palumbo mentioned that he was dissatisfied with the settlement reached with the Bank because he believed Akin Gump "gave away far too much." [16] Palumbo explained that he accepted the settlement agreement only because Samorajczyk "thought it was the best deal [Palumbo] could get." [17] In light of these problems, Palumbo urged Akin Gump to cut its overall bill in half.[18]

At the fee application hearings, Samorajczyk testified that he replied to Palumbo's letter, and he suggested that this was not the only time he received complaints from Palumbo regarding his fees.[19] Samorajczyk said that, "on more than one occasion," he offered to meet with Palumbo to discuss the specific entries and tasks Palumbo found objectionable.[20] Palumbo continually declined Samorajczyk's offers, choosing instead to make derogatory remarks about Samorajczyk and his firm, and stating further that he would only pay one-third or one-half of the total amount charged by Akin Gump.[21]

On December 22, 1992, this Court approved the settlement resolving the dispute with the Bank. That same day, Palumbo and the Partnership filed a joint motion for substantive consolidation of their bankruptcy estates. This Court granted their request to consolidate the estates in February 1993. Thereafter, Palumbo and the Partnership submitted a joint disclosure statement and reorganization plan, which proposed to pay all creditors in full except the Bank. Although the settlement had been approved, the Bank still objected to the plan because Palumbo was "slow or recalcitrant" in fulfilling his side of the settlement agreement.[22] Samorajczyk testified that he contemplated withdrawing as counsel since Palumbo's conduct threatened to unravel the settlement and it jeopardized plan confirmation. Although Samorajczyk felt inclined to stay with the case to ensure that the plan would be confirmed, he ultimately decided to discontinue his representation shortly before the plan was presented to the Court. In early April 1993, Akin Gump filed its notice of intent to withdraw from the case. The Partnership then obtained new counsel. At the last minute, Palumbo cured his defaults under the settlement agreement, and the Bank voted to accept the plan, which was subsequently confirmed on April 13, 1993. One week after confirmation, this Court approved Akin Gump's request to withdraw as counsel of record.

### B.

Shortly before it withdrew, Akin Gump applied for fees and expenses totaling $190,960 and $19,843, respectively. The United States Trustee objected to the application, principally on grounds that the hourly rate provided in the fee application exceeded the $175–per–hour ceiling set by this Court. The Partnership also indicated that it would challenge the fee application. On May 18, 1993, this Court held an evidentiary hearing *in camera* regarding the Partnership's objections, which lasted for three hours and involved only one witness—Samorajczyk. At this hearing, the Partnership addressed Akin Gump's use of the retainer, and the alleged conflict of interest created by Akin Gump when it performed work for both Palumbo and the Partnership. Among other things, Samorajczyk testified that the funds taken from the escrow account had been restored. After receiving exhibits and testimony, this Court continued the matter to June 21, 1993 for further hearing.

On May 26, 1993, the Partnership filed its notice requiring Samorajczyk to appear at a deposition and to produce certain documents. Akin Gump promptly filed a motion for a protective order, arguing that the discovery sought by the Partnership was untimely be-

---

15. *Id.*

16. *Id.* at 3.

17. *Id.*

18. *Id.*

19. Tr. of Aug. 18, at 57; *see also* Ex.T.

20. Tr. of Aug. 18, at 57–58, 83.

21. *Id.*

22. Tr. of May 18, at 112.

cause an evidentiary hearing on the fee application had already commenced. At a telephone conference, this Court decided to bifurcate the fee application hearing into two phases, and allow the Partnership to pursue discovery during the second phase. The Court originally contemplated that the first phase would pertain to whether the compensation requested by Akin Gump was reasonable and whether the services it rendered benefited the estate. The second phase would address whether Akin Gump intentionally drew on the funds contained in the escrow account, in violation of the August 4th Order, and whether the Partnership was entitled to sanctions.

On June 21, 1993, the hearings on Akin Gump's fee application resumed and dealt with the issues reserved for the first phase of this newly bifurcated proceeding. There, we reminded counsel that the proceeding had been bifurcated, and we admonished the Partnership's attorney not to examine Samorajczyk on the issue of intent until the second phase of the proceeding commenced. Additionally, Akin Gump disclosed that it had erroneously informed the Court, at the May 18th hearing, that it had refunded the money taken from the escrow account. Akin Gump assured the Court that, since the previous hearing, it had fully restored the funds with interest, and it introduced several documents showing the history of the escrow account and its current balance. After hearing additional testimony, this Court continued the matter to August 18, 1993 for a final hearing within the first phase of this proceeding.

At the conclusion of the August 18th hearing, we granted in part, and denied in part, the amounts sought by Akin Gump. After reviewing the evidence, we found that the services rendered by Akin Gump—particularly the settlement it negotiated—benefited Palumbo. Although we concluded that Akin Gump was entitled to a premium based on its accomplishments, we disallowed the fee request to the extent it exceeded the $175–per–

hour ceiling set by this Court. We further instructed Akin Gump to deposit the award in an interest-bearing account pending the outcome of the second phase of this proceeding. Pursuant to our order entered September 21, 1993, Akin Gump deposited the award of $131,283.87 into the registry of this Court.

The Partnership initiated the second phase of this proceeding by filing its motion for sanctions, which seeks to (1) revoke Akin Gump's authority to represent the Partnership,[23] (2) deny Akin Gump's fee application, and (3) obtain an award of fees and expenses incurred in opposing the fee application and in pursuing its sanctions motion. After filing the motion for sanctions, the Partnership served its discovery requests upon Akin Gump. In response, Akin Gump moved to dismiss the sanctions motion.

At a hearing on its motion to dismiss, Akin Gump characterized the sanctions motion as an attempt by the Partnership to rehash matters that had already been adduced at the previous hearings. To the extent the sanctions motion sought a "legitimate inquiry" into the issue of intent, Akin Gump argued that sanctions were unwarranted because the money taken from the escrow account had been restored and this Court had no criminal contempt powers to punish the violation of the August 4th Order. Accordingly, no further hearing on the intent issue was necessary.

In response, the Partnership asserted that the intent issue was inextricably tied to the evidence and testimony adduced at the previous hearings. It also argued that it had relied on the Court's decision to hold subsequent hearings on the issue of intent. After further argument, the following exchange took place between the Partnership's counsel and the Court:

> The Court: Well, Mr. Sullivan, what additional evidence do you intend to adduce now on your motion for sanctions?

**23.** At first glance, this form of relief seems odd inasmuch as Akin Gump has already withdrawn from the Partnership's case. Apparently, the Partnership would have us deny Akin Gump's employment application *nunc pro tunc*, which presumably would have the effect of denying

Akin Gump's compensation. Because employment and compensation are governed by the same "disinterested" requirement, *see* 11 U.S.C. §§ 327(a) & 328(c), we will treat this form of relief as yet another request to deny fees and expenses.

Mr. Sullivan: The facts which I know at this point that I intend to adduce are stated in the statement of facts in my motion for sanctions.

The Court: You rely on that.

Mr. Sullivan: Yes, Your Honor.[24]

We then took the Partnership's motion and Akin Gump's motion under advisement.

## II.

As a preliminary matter, we address the procedural posture of this case. We originally bifurcated this proceeding in order to accommodate the Partnership's request to conduct post-hearing discovery. As originally contemplated by this Court, the first phase was to involve whether the compensation sought by Akin Gump was reasonable while the second phase was to address whether Akin Gump intentionally disobeyed the August 4th Order. The Partnership's motion for sanctions, which initiated the second phase of this proceeding, is essentially a counterclaim insofar as it seeks to disallow or reduce the administrative claim asserted by Akin Gump. Akin Gump suggests that the Partnership's motion is a compulsory counterclaim because it is based on the transactions or occurrences that were dealt with at the previous hearings. *Cf.* Fed.R.Civ.P. 13(a). Although Akin Gump concedes that the narrow issue of intent was reserved for a subsequent phase of this proceeding, it argues nevertheless that the Court's decision to award fees and expenses constituted a "final order," so res judicata bars further litigation of all matters covered at the previous hearings.

In response, the Partnership argues that the Court's decision to award fees and expenses was not a "final order" for purposes of res judicata. It further asserts that the issue of intent is inextricably tied to the facts already adduced. For example, the Partnership suggests that, if it can show that Samorajczyk (1) intentionally exhausted the retainer, (2) knew that he exhausted the retainer, and (3) failed to persuade Palumbo to replenish the retainer, then it can prove that

the motion for substantive consolidation was, at bottom, an improper attempt to reach Palumbo's assets. Even though the issue of intent was reserved for a subsequent phase of this proceeding, it still forms the basis of an affirmative defense against the fee application. Therefore, argues the Partnership, further hearing and discovery are necessary, even at the expense of revisiting matters already addressed.

■ Under the doctrine of res judicata, a final judgment entered in a prior action "precludes the litigation by the plaintiff in a subsequent action of claims 'with respect to all or any part of the transaction, or series of connected transactions, out of which the [first] action arose.'" *Harnett v. Billman,* 800 F.2d 1308, 1314 (4th Cir.1986) (quoting Restatement (Second) of Judgments § 24(1) (1982)), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 763 (1987). Unlike the related doctrine of collateral estoppel, which precludes the subsequent litigation of issues that were actually litigated and decided in a prior proceeding, res judicata acts as a broader instrument of preclusion, for it not only bars "every matter which was offered and received to sustain or defeat the claim or demand, but [also] any other admissible matter which might have been offered for that purpose." *Cromwell v. County of Sac,* 94 U.S. 351, 352, 24 L.Ed. 195 (1876).

■ Even if our decision to award fees and expenses on an interim basis constituted a "final judgment" in this instance, res judicata still would not attach. Res judicata does not operate as a bar when a court has expressly reserved the claimant's right to bring the subsequent action or claim. Restatement (Second) of Judgments § 26(1)(b) (1982); *accord Washington Public Power Supply Sys. v. Pittsburgh–Des Moines Corp.,* 876 F.2d 690, 699 (9th Cir.1989) ("When a court reserves a question for further adjudication, a judgment does not bar subsequent determination of that question."); *cf. also Klem v. Greenwood,* 450 N.W.2d 738 (N.D.1990) (relying on the same restatement section cited

---

**24.** Tr. of Sept. 29, at 17. There is, however, no "statement of facts" contained in the sanctions motion itself. Rather, the "statement of facts" is

included in the Partnership's memorandum supporting the motion.

above, the court concluded that a judgment entered in a law firm's collection action did not bar the former client from bringing a legal malpractice suit when the parties previously agreed that the former client did not have to assert the malpractice claim as a compulsory counterclaim in the collection action). Because we reserved the issues of intent and sanctions for a subsequent proceeding, res judicata does not preclude the Partnership from addressing the transactions or occurrences that were dealt with at the previous hearings.

■ This does not mean, however, that the Partnership is entitled to further discovery or hearings. "Generally, a [trial] court has discretion not to hear oral testimony on motions." *Gary W. v. Louisiana*, 601 F.2d 240, 244 (5th Cir.1979) (citing *Wilkins v. Rogers*, 581 F.2d 399, 405 (4th Cir.1978); *United States Fid. & Guar. Co. v. Lawrenson*, 334 F.2d 464, 466–67 (4th Cir.), *cert. denied*, 379 U.S. 869, 85 S.Ct. 141, 13 L.Ed.2d 71 (1964)); *cf. Scutieri v. Paige*, 808 F.2d 785, 795 (11th Cir.1987); *cf. also Robeson Defense Comm. v. Britt (In re Kunstler)*, 914 F.2d 505, 519–21 (4th Cir.1990) (holding that the district court did not err in not holding an evidentiary hearing on whether a pleading was submitted for an improper purpose, in violation of Fed. R.Civ.P. 11), *cert. denied*, 499 U.S. 969, 111 S.Ct. 1607, 113 L.Ed.2d 669 (1991). At the hearing on Akin Gump's motion to dismiss, we asked the Partnership's attorney to specify the additional evidence he intended to adduce in support of the motion for sanctions. The attorney replied that the facts he intended to adduce were set forth in the "statement of facts" contained in the sanctions motion. We have carefully compared the "statement of facts" with the evidence already presented. Based on this analysis, we conclude that, in essence, all the statements of fact refer to circumstances covered at the previous hearings. The following sets forth the "facts" that are covered in the Partnership's statement and the portions of the record that address them:

(1) The commencement of bankruptcy proceedings for both Palumbo and the Partnership. Statement ¶¶ 1 & 2. Tr. of May 18, at 12, 16–17, 25; Ex. # 5.

(2) The receipt of the $75,000 retainer and Akin Gump's decision (or lack of decision) as to whether it would represent only the Partnership. Statement ¶¶ 3 & 4. Tr. of May 18, at 22–23, 68, 81; Tr. of June 21, at 56, 113, 221; Ex. # 8.

(3) Akin Gump's research into possible conflicts of interest and the internal office memorandum that was a product of this research. Statement ¶ 5. Tr. of May 18, at 70–72; Ex. B.

(4) The letter agreement formalizing the attorney-client relationship in which Palumbo agreed to guarantee payment of the Partnership's legal bills. Statement ¶ 6; Ex. # 1.

(5) The contents of the employment application filed by the Partnership to retain Akin Gump, the Court's order approving the application, which specified that any draws on the retainer account could not be done without prior court approval, and Akin Gump's alleged intent to draw on the retainer. Statement ¶¶ 7–9. Tr. of May 18, at 77–79, 83–85; Tr. of June 21, at 23–24; Ex. 2 & 3.

(6) The unauthorized draws on the retainer account, and the filing of a fee application that exceeded the maximum allowable rate of $175 per hour. Statement ¶¶ 10 & 11; Tr. of May 18, at 24, 84–85; Tr. of Aug. 18, at 120; Ex. # 8.

(7) The withdrawal of the $1,200 refund without court approval. Statement ¶¶ 13 & 16. Tr. of June 21, at 14–18, 31; Ex. # 8.

(8) The demands Samorajczyk allegedly made, urging Palumbo to look to sources "outside his estate" in order to pay professionals and to replenish the retainer account. Statement ¶¶ 12 & 16. Tr. of May 18, at 57; Tr. of June 21, at 123, 164–65, 235; Tr. of Aug. 18, at 62–65.

(9) The feasibility of a *Sandy Ridge* plan and the work Akin Gump performed with respect to Palumbo's individual case. Statement ¶¶ 14 & 15. Tr. of May 18, at 31–32, 90, 94–99; Tr. of June 21, at 223; Ex. G.

(10) The dispute between Palumbo and Samorajczyk over fees. Statement ¶¶ 17 &

19. Tr. of June 21, at 163–64, 166–67; Tr. of Aug. 18, at 57–58, 83; Ex. I & T.

(11) The purpose of the motion for substantive consolidation. Statement ¶ 17. Tr. of May 18, at 111–12; Tr. of June 21, at 98–99.

(12) The fee application filed by Akin Gump that (a) misidentified the Partnership as the source of the $75,000 retainer, and (b) failed to disclose the draws on the retainer account. Statement ¶ 20. Tr. of May 18, at 88–89; Tr. of June 21, at 34; Ex. 2 & 7.

The only portions of the "statement of facts" we have not mentioned are paragraphs 18, 21 and 22. Paragraph 18 alleges that Akin Gump failed to inform Palumbo and his attorney, Chad Pugatch, of the reasons for the substantive-consolidation motion. Again, this issue was addressed at the previous hearings. Another Akin Gump attorney responsible for the Partnership's case, Linda S. Broyhill, testified that she and Pugatch agreed that the benefit of consolidating the two estates was confirmation of a plan.[25] In addition, paragraph 21 alleges that Samorajczyk "testified with reckless disregard of the truth" concerning the status of the retainer account, namely whether the amounts withdrawn had been replaced. At the first hearing in May, Samorajczyk erroneously reported that the retainer had been restored.[26] Further questioning from the Partnership's attorney revealed that Samorajczyk was unsure as to when and where the retainer had been restored.[27] At the second hearing in June, Akin Gump presented the Court with a full accounting of the situation, and introduced bank statements showing that the funds had been restored with interest.[28] We believe Samorajczyk's erroneous testimony resulted from his unfamiliarity with the status of the account, and not from any "reckless disregard of the truth." In sum, the foregoing demonstrates that the Partnership's motion for sanctions is predicated on the transactions and occurrences that were addressed at three lengthy evidentiary hearings. We therefore see no reason why the limited resources of this Court should be taxed to address these matters again.

■ Paragraph 22 proclaims that the Partnership reserves the right to rely on further facts arising from discovery, and the Partnership further argues that it never had an opportunity to address the intent issue directly. Nevertheless, as we explain more fully below, we do not find any prejudice to the Partnership if additional discovery and hearings are foreclosed. We bifurcated this proceeding pursuant to Federal Rule of Civil Procedure 42(b), which permits a court to hold separate trials on any claim or issue "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy...." Fed. R.Civ.P. 42(b), *incorporated in* Fed. R.Bankr.P. 7042 & 9014. A decision to hold separate trials is interlocutory, and a trial court has discretion to revise or set aside its interlocutory orders before the entry of final judgment. *See* Fed.R.Civ.P. 54(b), *incorporated in* Fed.R.Bankr.P. 7054; *Partmar Corp. v. Paramount Pictures Theatres Corp.,* 347 U.S. 89, 100, 74 S.Ct. 414, 420, 98 L.Ed. 532 (1954); *O'Malley v. United States Fid. & Guar. Co.,* 776 F.2d 494, 500–01 (5th Cir. 1985) (per curiam). Although the facts of *Partmar* and *O'Malley,* cited *supra,* are not identical to the case at hand, the decisions are nevertheless instructive.

In the former case, Partmar and Paramount entered into a franchise agreement in which Partmar agreed to exhibit Paramount's "first-run" feature films at a cinema leased from Paramount. Thereafter, a decree was entered in an antitrust suit initiated by the United States against Paramount, and the decree enjoined Paramount from performing under existing franchise agreements and from entering into future franchise agreements. Paramount used the antitrust decree as cause for terminating Partmar's franchise and lease agreements. *Partmar Corp.,* 347 U.S. at 93, 74 S.Ct. at 417. When Partmar refused to vacate the leasehold

---

25. Tr. of June 21, at 99.

26. Tr. of May 18, at 85–86.

27. *Id.*

28. Ex. # 8.

premises, Paramount sued Partmar for unlawful detainer and for declaratory judgment. Partmar subsequently filed a counterclaim against Paramount seeking treble damages for alleged antitrust violations. Specifically, Partmar asserted that the franchise and lease agreements had "excessive terms and conditions" as a result of a conspiracy between Paramount and others that violated the antitrust laws. *Id.* at 93–94, 74 S.Ct. at 417.

The district court ordered separate trials for Paramount's claims and Partmar's counterclaims. *Id.* at 94–95, 74 S.Ct. at 417–418. Before trial, however, the United States Supreme Court overturned a portion of the antitrust decree, finding that Paramount's franchise agreements were not *per se* unlawful. The Supreme Court's decision placed Paramount in the "anomalous position" of arguing in the Partmar suit that the franchise and lease agreements violated the antitrust laws and therefore Paramount had a right to take possession of the leasehold premises. *Id.* at 95, 74 S.Ct. at 417. Following the trial on Paramount's claims, the district court found that the franchise and lease agreements were not illegal, so Paramount had no basis for terminating them. The district court also found a lack of sufficient evidence on the issue of conspiracy, and therefore dismissed Partmar's counterclaims without proceeding to the second trial. *Id.* at 96–98, 74 S.Ct. at 418–420. On appeal, Partmar did not challenge the district court's findings pertaining to Paramount's claims, but challenged instead the dismissal of its counterclaims without the benefit of trial. The United States Supreme Court affirmed the dismissal, concluding that the district court's finding of no conspiracy was material to Paramount's action. Accordingly, Partmar was collaterally estopped from using conspiracy as a basis for its counterclaims. *Id.* at 101, 74 S.Ct. at 421.

Similarly in *O'Malley*, a mudslide destroyed buildings and other property that were allegedly covered by insurance policies. The insurer, USF & G, determined that excessive rainfall caused the mudslide, and therefore denied coverage based on a water-damage exclusion contained in the policies.

*O'Malley*, 776 F.2d at 496. The insureds sued USF & G, seeking coverage and also alleging that USF & G had acted in bad faith. The district court ordered separate trials on the issues of coverage and bad faith, and it received evidence on the issue of coverage first. *See id.* The court found that excessive rain caused the mudslide, and on that basis, it concluded that the terms of the policies excluded the mudslide damage from coverage. *Id.* It then dismissed the bad-faith claims without further hearing after it concluded that applicable state law barred recovery from an insurance company on bad-faith grounds if the insured failed to prevail on the issue of coverage. One of the insureds challenged the dismissals on appeal. The Court of Appeals for the Fifth Circuit ruled that the insured was not entitled to recover on the issue of bad-faith, and thus concluded that the district court did not abuse its discretion when it ordered separate trials and later dismissed the bad-faith claims. *Id.* at 500–01.

■ The principle to be drawn from *Partmar* and *O'Malley* is that a court has discretion not to hold a subsequent trial if the evidence already adduced can resolve the issues reserved for the subsequent trial. Of course, the court of appeals in *O'Malley* emphasized that the insured had ample opportunity to introduce evidence relevant to coverage, *see id.* at 501, and it could be argued that, in contrast, the Partnership never had an opportunity to introduce evidence concerning the issue of intent. However, the Partnership's motion for sanctions relies on the transactions and occurrences that were adduced at the previous hearings. Furthermore, we need not reach the issue of intent because the Partnership's position falls short in other respects. In addition to its statement of facts, the Partnership has provided a "statement of authorities" enumerating several points of law in support of its motion for sanctions. In the discussion below, we will address the law cited by the Partnership in conjunction with the evidence already presented. We note, based on the following discussion, that discovery and hearings on the issue of intent are unnecessary because the Partnership's position fails on other grounds, and thus the Partnership is not

entitled to the sanctions requested. Accordingly, we address the authorities cited by the Partnership *seriatim*.

### A.

Relying on both the Bankruptcy Code and the Virginia Code of Professional Responsibility, the Partnership urges us to disallow Akin Gump's compensation on grounds that a conflict of interest arose when Akin Gump accepted a retainer and guaranty from Palumbo himself, and when Akin Gump performed work for both Palumbo and the Partnership. As we explain more fully below, both the Bankruptcy Code and the Virginia Code of Professional Responsibility govern the Court's analysis in deciding whether a conflict has compromised an attorney's representation of a Chapter 11 debtor. We begin our discussion with the Bankruptcy Code.

The Bankruptcy Code allows a debtor-in-possession to employ attorneys and other professionals so long as they are "disinterested persons" who "do not hold or represent an interest adverse to the estate...." 11 U.S.C. § 327(a). An attorney representing a debtor-in-possession cannot be disqualified from employment "solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest." *Id.* § 327(c). To enforce these provisions, the Bankruptcy Code authorizes courts to deny compensation and the reimbursement of expenses if, at any time during the representation, the attorney "is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such [attorney] is employed." *Id.* § 328(c).

As defined by the Code, a "disinterested person" is one who "is not a creditor, an equity security holder, or an insider." *Id.*

§ 101(14)(A). Furthermore, a "disinterested person" is one who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders...." *Id.* § 101(14)(E). *In re McKinney Ranch Associates*, 62 B.R. 249 (Bankr.C.D.Cal.1986), the court held that an attorney representing both a debtor limited partnership and its general partner was not a "disinterested person" as a matter of law, explaining that a general partner "will always be a potential target of claims by a limited partnership debtor." *Id.* at 255. The court reasoned that a general partner is often the fiduciary who made the day-to-day decisions that led the partnership into bankruptcy. *Id.* at 255. Therefore, explained the court, a general partner is vulnerable to charges of "breach of fiduciary duty or securities law violations." *Id.* In addition, general partners may be defendants in actions to recover fraudulent or preferential transfers, and they may be exposed to personal liability resulting from guarantees of certain partnership debt. *Id.*

■ Although the concerns raised by the court in *McKinney Ranch* are noted, we decline to follow *McKinney Ranch* and similar decisions for the simple reason that the Court of Appeals for the Fourth Circuit discourages the use of *per se* rules when evaluating disinterestedness, favoring instead a fact-intensive inquiry into the situation presented. *See Harold & Williams Dev't Co. v. United States Trustee (In re Harold & Williams Dev't Co.)*, 977 F.2d 906, 909–10 (4th Cir.1992) ("Because the few absolute disqualifications Congress has established are carefully delineated and narrowly tailored, the courts must take care not to fashion *absolute* prohibitions beyond those legislatively mandated without some measure of assurance that the purposes of the Bankruptcy Code *always* will be served thereby." (internal footnote omitted)).[29]

---

**29.** In the same vein, although the parties have not raised the issue here, there has been considerable debate among the courts as to whether a "potential" conflict of interest, as opposed to an "actual" conflict, is enough to warrant disqualification or a denial of fees. *See In re Leslie Fay Co.*, 175 B.R. 525, 532 (Bankr.S.D.N.Y.1994) (cit-

ing cases). We believe, however, that the debate is "more semantic than substantive," *id.*, and that Fourth Circuit precedent dictates that we consider the facts presented rather than any bright-line rules that are not contained in the Bankruptcy Code. *See also In re Martin*, 817 F.2d 175, 181–82 (1st Cir.1987) ("Th[e] inquiry

As for the facts at hand, the Partnership argues that it enjoyed an existence separate from Palumbo. It further maintains that its interests diverged from Palumbo's when Palumbo provided the retainer to Akin Gump and guaranteed payment of the Partnership's legal bills. The Partnership's theory of the case may be summarized as follows: Palumbo became a "contingent creditor" of the Partnership when he paid the retainer and made the guaranty. Had Akin Gump implemented a *Sandy Ridge* plan, and forced the Bank to "write a check," the Partnership could have used the money paid by the Bank to cover Akin Gump's legal bills, thus eliminating Palumbo's personal exposure under the guaranty. This, as we know, did not happen. Not only did Akin Gump fail to effectuate a *Sandy Ridge* plan, but it also drew on the retainer, which made Palumbo an actual creditor of the Partnership. Akin Gump then became reliant on Palumbo to replenish the retainer. When Palumbo declined to provide further retainers, Akin Gump moved to consolidate the two bankruptcy estates. Therefore, argues the Partnership, Palumbo was not only a creditor, but his interests were adverse to those of the Partnership.

The problem with this elaborate theory is the false premise that the Partnership enjoys a separate legal existence. We believe, instead, that Palumbo and the Partnership are inextricably tied together. Palumbo is both a general partner and limited partner owning a 97% interest in the Partnership. Although his wife holds the remaining 3% interest, we believe her share is *de minimis,* particularly in light of the circumstances. Unlike other limited partnerships, the Partnership was not formed as an investment vehicle to benefit its limited partners. Rather, Palumbo created the Partnership to thwart a foreclosure sale of land he owned. It was Palumbo who contributed the land. It was also Palumbo who personally owed money to the Bank. Additionally, the Partnership had no employees when it filed for bankruptcy. Taking into account all these circumstances, we conclude that Palumbo and the Partnership are one and the same. Thus we do not believe that Palumbo's interests were adverse to those of the Partnership. Had Palumbo become subrogated to the rights of Akin Gump, he would have owed himself the money. This hardly makes him a "creditor."

### B.

The Partnership next asserts that Akin Gump violated the Virginia Code of Professional Responsibility when it accepted the retainer directly from Palumbo. *See* Va. Code of Professional Responsibility DR 5–106(A).[30] Additionally, the Partnership suggests that, in accepting the retainer, Akin Gump allowed Palumbo to influence its professional judgment in violation of Disciplinary Rule 5–106(B)[31] and Ethical Considerations 5–22[32] and 5–23.[33]

In response, Akin Gump emphasizes the difference between disciplinary rules and ethical considerations within the Virginia Code of Professional Responsibility. Unlike disciplinary rules, ethical considerations are "aspirational in character" and, as such, they fail to supply a basis for invoking sanctions. In addition, Akin Gump argues that disciplinary rules themselves simply represent general standards of professional conduct and they likewise fail to supply a cause of action to private litigants.

[into disinterestedness] is of necessity case-specific.").

**30.** Disciplinary Rule 5–106(A)(1) prohibits attorneys from accepting "compensation for his legal services from one other than his client," unless the client consents after "full and adequate disclosure."

**31.** Disciplinary Rule 5–106(B) prohibits an attorney from "permit[ting] a person who ... employs, or pays [the attorney] to render legal services for another to direct or regulate his professional judgment in rendering such services."

**32.** In pertinent part, EC 5–22 admonishes that "if a lawyer if [sic] compensated from a source other than his client, he may feel a sense of responsibility to someone other than his client."

**33.** Among other things, EC 5–23 provides: "Since a lawyer must always be free to exercise his professional judgment without regard to the interests or motives of a third person the lawyer who is employed by one to represent another must constantly guard against erosion of his professional freedom."

■ We agree that violations of the Virginia Code of Professional Responsibility do not supply a private right of action to recover damages or to deny attorney compensation. The preamble of the Virginia Code of Professional Responsibility explains that ethical considerations are "aspirational in character and represent the objectives toward which every member of the profession *should* strive." (Emphasis added). Moreover, several ethical considerations use the term "should," as opposed to the mandatory "shall," which again emphasizes their aspirational quality. *See e.g.,* Virginia Code of Professional Responsibility EC 1–5, EC 2–25, EC 4–6. Aspirational guidelines hardly supply a private right of action, and the Partnership has not identified any federal interest that would require us to treat ethical considerations as something more than aspirational. *Cf. Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) (holding that federal courts should recognize the property interests "created and defined by state law" unless "some federal interest requires a different result....").[34]

Unlike ethical considerations, disciplinary rules are "mandatory in character" inasmuch as they set forth "the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action." *See* Virginia Code of Professional Responsibility preamble. Notwithstanding their "mandatory" nature, disciplinary rules are regulations used by the disciplinary arm of the Virginia State Bar. As such, they do not supply a cause of action to private litigants for the recovery of damages. *See Carter v. Williams,* 246 Va. 53, 60, 431 S.E.2d 297 (1993) ("The Code of Professional Responsibility does not provide a basis for private causes of action."); *Ayyildiz v. Kidd,* 220 Va. 1080, 1085, 266 S.E.2d 108 (1980) (same).

■ Although the Virginia Code of Professional Responsibility does not provide a cause of action to private litigants, it is still relevant to our analysis. Each federal court "has the power to control admission to its bar and to discipline attorneys who appear before

it," *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991), and the Virginia Code of Professional Responsibility provides this Court with the standards for evaluating attorney conduct. *See* Local Rule 105(I). For example, one decision has looked to the Virginia Code of Professional Responsibility in deciding whether to grant a motion to disqualify counsel. *See Stokes v. Firestone (In re Stokes),* 156 B.R. 181, 185 (Bankr.E.D.Va.1993) ("[W]hile the Code of Professional Responsibility is a source by which courts may be guided, it is not dispositive in a motion to disqualify."). Likewise, we believe it is appropriate to use the Code of Professional Responsibility as a guide for determining whether an attorney is not "disinterested," and thus not entitled to compensation under 11 U.S.C. § 328(c). Hence, a violation of Disciplinary Rule 5–106 is indicative, not dispositive, on the disinterestedness issue. *Cf. Stokes,* 156 B.R. at 185.

■ We begin our analysis by looking to the plain terms of Disciplinary Rule 5–106, which provide that "a lawyer shall not ... [a]ccept compensation for his legal services from one *other than his client.*" Va.Code of Professional Responsibility DR 5–106(A)(1) (emphasis added). Disciplinary Rule 5–106 also mandates that "[a] lawyer shall not permit a person who ... employs, or pays him to render legal services *for another* to direct or regulate his professional judgment in rendering services." *Id.* DR 5–106(B) (emphasis added). As set forth above, we can reach no other conclusion but that Palumbo and the Partnership are one and the same, so this is hardly a situation where one person is paying an attorney to provide legal services for another, or even a case where a third party is trying to influence a lawyer's professional judgment.

■ The underlying purpose of DR 5–106 is expressed in the corresponding ethical considerations. Ethical Consideration 5–23 explains that third parties who pay lawyers "may be interested in furthering their own economic, political, or social goals without

---

**34.** Of course, one "federal interest" we have identified is 11 U.S.C. § 328(c), which requires attorneys to remain "disinterested" if they seek to recover compensation from the estate. We address the pertinent ethical considerations in light of § 328(c) below.

regard to the professional responsibility of the lawyer to his individual client." *Id.* EC 5–23. In addition, these third parties "may be far more concerned with establishment or extension of legal principles than in the immediate protection of the rights of the lawyer's individual client." *Id.* Hence "[e]conomic, political, or social pressures by third persons are less likely to impinge upon the independent judgment of a lawyer in a matter in which he is compensated directly by his client...." *Id.* EC 5–22. The problem identified in these ethical considerations becomes far more pronounced in bankruptcy where a creditor paying a retainer to debtor's counsel can use the retainer as leverage to extract an unfair advantage over the debtor and other creditors. *See In re Glenn Elec. Sales Corp.,* 99 B.R. 596, 602 (D.N.J. 1988).

This type of situation was presented to us in *In re Huntmar Beaumeade I Limited Partnership,* 127 B.R. 363 (Bankr.E.D.Va. 1991), a case cited by the Partnership here. Although *Huntmar* did not deal with the foregoing ethical considerations directly, it did address a problem contemplated by them. In *Huntmar,* a corporation paid separate retainers to a law firm that sought to represent two related debtors. The corporation was controlled by an individual who held both unsecured and contingent claims against the debtors. *Id.* at 364–65. In addition, the individual controlled a limited partnership that held a 45% interest in one debtor, and another limited partnership that held a 45% interest in the other debtor. *Id.* The law firm did not disclose the full extent of this conflict until a creditor and the United States Trustee objected to its employment application. *Id.* Finding that the law firm was no longer "disinterested" because it received the retainers, we denied the law firm's request to represent the debtors. *Id.* at 365–66.

The Partnership argues that, as in *Huntmar,* the instant case involves a "contingent creditor" (Palumbo) who paid a retainer to debtor's counsel. Yet even if we assume Palumbo was a creditor, the Partnership fails to describe how Palumbo could have gained an unfair advantage over other creditors. For one thing, the Partnership had no unsecured creditors when it filed for bankruptcy. The only other "creditor" involved in the Partnership's case was the Bank, which held the liens encumbering the Partnership's sole asset, the Buck–Mark property. Furthermore, the person who paid the retainer in this instance (Palumbo) was personally liable on the obligations to the Bank. The Partnership has failed to show us how Palumbo could have obtained an unfair advantage when the Bank had recourse against the Partnership's property and Palumbo himself. We therefore find *Huntmar* inapposite.

The Partnership has also failed to show us how Palumbo could have influenced Akin Gump's professional judgment to the Partnership's detriment. As mentioned before, the financial problems of both Palumbo and the Partnership were inextricably linked: Palumbo had a 97% interest in a partnership that held land securing a debt that Palumbo personally owed. Thus, any successful resolution of the Partnership's bankruptcy had to involve Palumbo. Even if we assume that Palumbo and the Partnership were separate entities, we still would not find any conflict, for both Palumbo and the Partnership were interested in pursuing a *Sandy Ridge* plan. Moreover, the record reflects that the *Sandy Ridge* concept became unfeasible not as a result of any "undue influence" on Palumbo's part, but because the initial appraisals of Buck–Mar were too low. For these reasons, we believe no conflict arose that undermined Akin Gump's duty to remain disinterested. We therefore find no basis for disallowing compensation under 11 U.S.C. § 328(c).

### C.

The foregoing does not end our discussion concerning ethical considerations. Indeed, the Partnership argues that Samorajczyk failed to avoid disputes with Palumbo over fees, in violation of Ethical Consideration 2–25.[35] As mentioned before, the ethical considerations contained in the Virginia

---

35. EC 2–25 admonishes that "[a] lawyer should be zealous in his efforts to avoid controversies over fees with clients and should attempt to resolve amicably any differences on the subject. He should not sue a client for a fee unless necessary to prevent fraud or gross imposition by the client."

Code of Professional Responsibility are merely aspirational and, as such, they fail to supply a cause of action to private litigants. *See Carter*, 246 Va. at 60, 431 S.E.2d 297; *Ayyildiz*, 220 Va. at 1085, 266 S.E.2d 108.[36]

Even if EC 2–25 did supply a right of action, we would still decline to impose sanctions because we find no violation of EC 2–25; the evidence here reflects that Samorajczyk was zealous in his efforts to avoid a controversy with Palumbo over fees. When Palumbo wrote letters to Samorajczyk, complaining of Akin Gump's legal bills, Samorajczyk asked Palumbo to specify the entries he found objectionable. Palumbo declined to do so. Instead, he made derogatory remarks toward Samorajczyk, and declared that he would pay only one-third or one-half of the overall amount charged by Akin Gump. At the fee-application hearings, Palumbo admitted that he was a "difficult" client, particularly when, in his view, the amounts charged to him were "excessive and unnecessary."[37] We believe the concept of the "two-edged sword" is applicable to the attorney-client relationship; clients cannot intentionally be "difficult" over fees, and then expect to recover sanctions under EC 2–24. For this reason, we decline to impose sanctions here.

The Partnership also points to a rule requiring active members of the Virginia State Bar to deposit client funds in an interest-bearing trust account unless certain exceptions exist. *See* Va.Sup.Ct.R. part 6, § IV, ¶ 20 [hereinafter "Paragraph 20"]. The Partnership suggests that Akin Gump violated Paragraph 20 when (1) it initially failed to place the $75,000 retainer in an interest-bearing account, and (2) it drew on the re-

tainer and the $1,200 refund from a real-estate appraiser without first seeking court approval.

What the Partnership ignores, however, is that Paragraph 20 grants the Virginia State Bar, not private litigants, the power to enforce its provisions. Subparagraph (G)(2) provides that the "[f]ailure to comply with this rule shall subject the active member to the administrative sanctions set forth in paragraph 19 herein." *Id.* ¶ 20(G)(2). Paragraph 19, in turn, directs the Virginia State Bar to mail a notice instructing the delinquent attorney to comply with the rule and to pay a delinquency fee. *Id.* ¶ 19. If the attorney fails to do so after receiving notice, the Virginia State Bar can suspend the attorney's license to practice law. *Id.* Accordingly, only the Virginia State Bar has the ability to pursue violations of Paragraph 20. Although the failure to keep client funds in an interest-bearing account may give rise to a breach-of-fiduciary-duty claim, we observe that the Partnership has not relied on this specific legal theory. Instead, the Partnership seeks a private remedy based on Paragraph 20 alone, when none is available.[38]

Even if Paragraph 20 did supply some form of relief to private litigants, we would still decline to impose sanctions. The evidence in this case reflects that Akin Gump placed the retainer in an interest-bearing account shortly after the United States Trustee objected to Akin Gump's employment application. As for the withdrawals of the retainer and refund, we note that Akin Gump has restored them with interest. Akin Gump has thus remedied the injury it

---

**36.** We believe the same analysis applies to Canon 9 of the Virginia Code of Professional Responsibility, which Akin Gump allegedly violated. Canon 9 provides that "[a] lawyer should avoid even the appearance of professional impropriety." According to the preamble of the Virginia Code of Professional Responsibility, the canons merely articulate the "axiomatic norms" of professional conduct, and they "embody the general concepts from which the Disciplinary Rules and the Ethical Considerations are derived." "Axiomatic norms" and "general concepts" do not supply a private right of action that enables a client to obtain damages. The Partnership must therefore find a more concrete and *actionable* basis for recovering them.

**37.** Tr. of Aug. 18, at 38.

**38.** Under certain circumstances, an attorney violating Paragraph 20 may also be subject to the disciplinary procedures outlined in Va.Sup.Ct.R. pt. 6, § IV, ¶ 13. These procedures are administrative insofar as they operate under the auspices of the Virginia State Bar. Among other things, they address whether an attorney's license to practice law should be suspended or revoked. *See id.* They do not address whether an attorney's request for compensation should be denied under the Bankruptcy Code.

caused. On this basis, we decline to impose the sanctions requested by the Partnership.

### D.

The Partnership alleges that Akin Gump violated the automatic stay when it (1) drew on the $75,000 retainer; (2) "converted" the $1,200 refunded by a real-estate appraiser; and (3) filed a motion to consolidate the two bankruptcy estates. To recover damages that would offset the compensation awarded to Akin Gump, the Partnership must look to 11 U.S.C. § 362(h), which provides: "An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." *Id.* For the moment we will assume the Partnership is an "individual" for purposes of § 362(h). *Cf. Budget Svc. Co. v. Better Homes of Virginia, Inc.,* 804 F.2d 289, 292 (4th Cir.1986) (holding that a debtor corporation qualifies as an "individual" under § 362(h)). Even when we make this assumption, the Partnership's position still cannot be substantiated.

■ First, the motion for substantive consolidation filed by Akin Gump on behalf of the Partnership did not violate the automatic stay. Akin Gump filed the motion in this Court, and provided notice of the motion "to all creditors and other parties in interest and the United States Trustee." [39] Following notice and an opportunity to be heard, we granted the motion for substantive consolidation pursuant to the powers available under 11 U.S.C. § 105(a). *See Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.),* 860 F.2d 515, 518 n. 1 (2d Cir.1988) ("Courts have found the power to consolidate substantively in the court's general equitable powers as set forth in 11 U.S.C. § 105. . . ."). The case at hand is hardly a situation where a creditor indulges in self-help or exercises its state-law remedies without first seeking permission from a bankruptcy court. We therefore find no violation of the stay in this respect.

■ As to the $75,000 retainer and $1,200 refund, we find no basis for awarding damages, for even if Akin Gump willfully violated the stay, the violation did not harm the Partnership. Section 362(h) permits only those individuals who have been "injured" by a willful violation of the automatic stay to recover money damages. 11 U.S.C. § 362(h). In other words, absent proof of injury, a technical violation of the stay, no matter how willful, is not enough to support an award of damages. *Whitt v. Philadelphia Hous. Auth. (In re Whitt),* 79 B.R. 611, 616 (Bankr. E.D.Pa.1987); *see also In re Freunscht,* 53 B.R. 110, 113 (Bankr.D.Vt.1985) ("Even if we were to find a violation of the stay . . . § 362(h) requires a finding of actual injury, and here there was none."). In this instance, Akin Gump has restored the $75,000 and the $1,200 refund with interest, and has thus repaired any harm it caused.

Additionally, the withdrawal of funds from the escrow account did not interfere with any duty owed to creditors. *See* 11 U.S.C. § 1107(a) (providing that a debtor-in-possession has the rights, powers and duties of a trustee in a Chapter 11 case). Akin Gump was instrumental in forging the settlement with the Bank, which resolved a long-running and highly-acrimonious dispute. Akin Gump also played a key role in drafting the joint plan of reorganization that proposed to pay all creditors (except the Bank) in full. We eventually confirmed this joint plan. There is no argument here that Akin Gump's use of the escrowed funds prevented any creditor from receiving payment on a claim. We therefore find no injury that would give the Partnership the ability to recover damages under § 362(h).

■ The Partnership suggests that Akin Gump's conduct injured Palumbo—the alleged "creditor" in the Partnership's case. We are unpersuaded. Palumbo not only emerged uninjured, but he also reaped substantial benefits with Akin Gump's assistance. To repeat, Akin Gump was instrumental in forging the settlement that resolved Palumbo's bitter dispute with the Bank. The settlement ended state-court litigation in which the Bank stood to win a $20 million judgment against Palumbo. Also, un-

**39.** Ex.F.

der the settlement's terms, the Bank forgave approximately $5.6 million worth of debt that Palumbo personally owed. Finally, Akin Gump structured the settlement in a way that gave Palumbo approximately $1 million in tax savings. Although Palumbo feels that Akin Gump "gave away far too much" in negotiating the settlement, we believe, in light of our findings above, that he has not suffered any injury as a result of Akin Gump's conduct, but rather has benefited substantially thereby. Accordingly, we deny the Partnership's request for damages.[40]

### E.

We turn now to Federal Rule of Bankruptcy Procedure 9011, which the Partnership cites as additional authority for imposing sanctions. As the bankruptcy counterpart to Federal Rule of Civil Procedure 11,[41] Rule 9011 requires at least one individual attorney or *pro se* litigant to sign "[e]very petition, pleading, motion and other paper served or filed in a case under the [Bankruptcy] Code...." Fed.R.Bankr.P. 9011(a). Through his or her signature, the attorney effectively certifies that the document is "well grounded in fact," legally tenable, and "not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation or administration of the case." *Id.;*

*Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 393, 110 S.Ct. 2447, 2454, 110 L.Ed.2d 359 (1990). If a court finds that a document is frivolous or interposed for an improper purpose, Rule 9011 requires the court to impose an "appropriate sanction," *see* Fed.R.Bankr.P. 9011(a), although the court has discretion in determining what the sanction will be. *See Cabell v. Petty,* 810 F.2d 463, 466 (4th Cir.1987). "What is 'appropriate' may be a warm friendly discussion on the record, a hard-nosed reprimand in open court, compulsory legal education, monetary sanctions, or other measures appropriate to the circumstances." *Thomas v. Capital Sec. Servs., Inc.,* 836 F.2d 866, 878 (5th Cir.1988) (en banc).[42] By providing for sanctions, the drafters envisioned that Rule 11 and Rule 9011 would "discourage dilatory or abusive tactics and help to streamline the litigation process by lessening frivolous claims or defenses." Fed.R.Civ.P. 11 advisory committee's note.

According to the Partnership, three documents filed by Akin Gump violate Rule 9011. The Partnership contends first that the motion for substantive consolidation was interposed for an improper purpose. Additionally, Akin Gump's employment and fee applications violate Rule 9011 because they are not well grounded in fact. Akin Gump responds that Rule 9011 does not apply to the attor-

**40.** Our analysis applies to both actual and punitive damages. Although the purpose of punitive damages is "not so much to compensate ... but to punish the wrongdoer and to warn others," *Hamilton Dev't Co. v. Broad Rock Club, Inc.,* 248 Va. 40, 45, 445 S.E.2d 140 (1994), we believe the plain terms of § 362(h) require "injury" as a precondition for recovering punitive damages. *Cf. Ford Motor Credit Co. v. Reynolds & Reynolds Co. (In re JKJ Chevrolet, Inc.),* 26 F.3d 481 (4th Cir.1994).

**41.** Rule 9011 applies in all bankruptcy cases, *see* Fed.R.Bankr.P. 1001, and it is modeled after the Rule 11 that predates the 1993 amendments to the Federal Rules of Civil Procedure. Although the rules are equivalent, they have not shared similar language since the 1993 amendments took effect. For instance, unlike Rule 9011, the current Rule 11 contains a "safe harbor" provision that enables attorneys to withdraw or correct their papers before sanctions may be imposed. *See* Fed.R.Civ.P. 11(c)(1)(A). Nevertheless, because the rules are equivalent, we will refer to them interchangeably, and we will look to non-bankruptcy decisions interpreting Rule 11

that predate the 1993 amendments. *See Cohn v. United States Trustee (In re Ostas),* 158 B.R. 312, 320 n. 13 (N.D.N.Y.1993).

**42.** The Court of Appeals for the Fourth Circuit has also ruled that "[i]n choosing a sanction '[t]he basic principle ... is that the least severe sanction adequate to serve the purpose should be imposed.'" *Cabell,* 810 F.2d at 466 (quoting Hon. William W. Schwarzer, *Sanctions Under the New Federal Rule 11—A Closer Look,* 104 F.R.D. 181, 201 (1985)). Additionally, "where it is a first violation, a reprimand from the court will suffice." *Id.* at 467 n. 5 (quoting Schwarzer, *supra,* 104 F.R.D. at 201); *see also Robeson Defense Committee v. Britt (In re Kunstler),* 914 F.2d 505, 522 (4th Cir.1990) ("We have ... held that the least severe sanction adequate to serve the purposes of Rule 11 should be imposed. It is clear that Rule 11 should not blindly be used to shift fees." (citation omitted)), *cert. denied,* 499 U.S. 969, 111 S.Ct. 1607, 113 L.Ed.2d 669 (1991).

ney-client relationship, so it is not a cause of action available to disgruntled clients. Therefore, Rule 9011 is not available here as a basis for recovering sanctions. Accordingly, we turn to the issue of whether former clients may seek sanctions under Rule 9011.

■ Similar to statutes, "[w]e ... interpret [Rule 9011] according to its plain meaning." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 391, 110 S.Ct. 2447, 2453, 110 L.Ed.2d 359 (1990) (citing *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 123, 110 S.Ct. 456, 458, 107 L.Ed.2d 438 (1989)). "[T]he sole function of the courts is to enforce [the statute or rule] according to its terms." *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917), *quoted in Ford Motor Credit Co. v. Reynolds & Reynolds Co. (In re JKJ Chevrolet, Inc.)*, 26 F.3d 481, 483 (4th Cir.1994). The Court of Appeals for the Fourth Circuit has elaborated further:

> Only in those rare instances in which there is a clearly expressed legislative intent to the contrary, in which a literal application of the statute would thwart its obvious purpose, or in which a literal application of the statute would produce an absurd result, should the courts venture beyond the plain meaning of the statute.

*JKJ Chevrolet*, 26 F.3d at 483–84 (citations omitted).

In pertinent part, Rule 9011 provides that "[i]f a document is signed in violation of this rule, the court on motion or on its own initiative, shall impose ... an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the [frivolous or improper] filing. . . ." Fed. R.Bank.P. 9011(a). By its terms, Rule 9011 permits a court to impose sanctions *sua sponte* or "on motion." *Id.* Although the rule does not specify who may bring such a "motion," the phrase "other party or parties" certainly suggests that the opposing litigant injured by the violation may file the motion.

■ If the opposing litigant is a former client, may the client recover Rule 9011 sanctions for documents filed on his or her behalf? For the reasons set forth below, we do not so find. Although a literal interpretation of the rule suggests that the phrase "other party or parties" includes former clients, such an interpretation would thwart the rule's purpose and lead to an absurd result. The Supreme Court has held that Rule 11 applies to clients who have signed documents, even if they are represented by counsel. *Business Guides Inc. v. Chromatic Communications Enter., Inc.*, 498 U.S. 533, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991). Allowing clients to recover monetary sanctions based on these documents would frustrate the "personal, nondelegable responsibility" each signer has "to validate the truth and legal reasonableness of the papers filed. . . ." *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 126, 110 S.Ct. 456, 460, 107 L.Ed.2d 438 (1989) (holding that the individual attorney who signed the document is subject to Rule 11 sanctions, not his law firm). Such an interpretation would also allow clients to seek Rule 11 sanctions against counsel after the courts have imposed Rule 11 sanctions on the clients. This would lead to the type of "satellite litigation" Rule 11 discourages. *See* Fed.R.Civ.P. 11 advisory committee's note.

■ Additionally, Rule 11 does not provide relief to clients whose attorneys signed the delinquent pleadings. As agents of their clients, attorneys are regarded as having either express or apparent authority to sign and file documents on their clients' behalf. Rule 9011 contemplates this agency relationship by allowing courts to impose sanctions on either the "person who signed [the document]" or "the represented party." Fed. R.Bank.P. 9011(a). As the Supreme Court has explained, "[t]he main objective of [Rule 11] is not to reward parties who are victimized by litigation; it is to deter baseless filings and curb abuses." *Business Guides*, 498 U.S. at 553, 111 S.Ct. at 934. Certainly, an absurd result would occur if we allowed clients to authorize, either expressly or tacitly, "baseless filings" and "abuses," and then permitted them to recover sanctions for these violations.

■ Former clients have other avenues available, such as a malpractice suit, if they seek to redress the harm caused by

attorney misconduct. Indeed, a claim for malpractice arises when the attorney breaches a duty owed to the client. *See* Va.Code § 54.1–3906 (Michie 1994). In contrast, the responsibilities connected with Rule 11 stem from a duty owed to the court. *See* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1331, at 21 (2d ed. 1990) ("[Rule 11's] certification requirement ... mandates that all signers consider their behavior in terms of the duty they owe to the court system to conserve its resources and avoid unnecessary proceedings." (footnote omitted)). Thus, Rule 11 is not a federal cause of action available to remedy legal malpractice. We therefore hold that Rule 9011 is unavailable to former clients when they sign the delinquent documents themselves or when their attorneys sign these documents on their behalf. *See Weiss v. Johnson (In re Rolls Constr. Corp.),* 108 B.R. 807, 808–09 (Bankr.S.D.Fla.1989) (also holding that clients may not seek Rule 11 sanctions against their attorneys).

 Applying this principle, we conclude that the Partnership may not seek Rule 9011 sanctions with respect to Akin Gump's employment application and the motion for substantive consolidation. As to the employment application, the Partnership filed this document on its own behalf. The application plainly states that "[t]he above-referenced debtor-in-possession [the Partnership], hereby makes application ... for authority to employ counsel...." and, in addition to Samorajczyk's signature, the document appears to bear the signature of Palumbo acting in his capacity as general partner.[43] As to the motion for substantive consolidation, the Partnership currently contests the value and purpose of the motion. Yet the fact remains that Akin Gump filed it on behalf of the Partnership.[44] Thus, Rule 9011 is unavailable with respect to these documents.

 Akin Gump's fee application presents a different situation. Both the language of the fee application and the circumstances of the case demonstrate that Akin Gump filed this document not as an agent of the Partnership, but rather as a potential administrative creditor. Although the fee application identifies Akin Gump as "[c]ounsel for [the Partnership], the Debtor in Possession herein," it is still apparent from the face of the document that Akin Gump is the party seeking a recovery from the estate.[45] In addition, Akin Gump submitted its fee application at or around the same time it filed its request to withdraw from the Partnership's case. Both the language of the fee application and the circumstances of the case reflect that Akin Gump's role vis-á-vis the debtor had changed. By the time it filed the fee application, Akin Gump was no longer an agent of the Partnership. Instead, it was either an adversary or, at very least, a potential adversary. Rule 9011 applies to documents that are directed toward adversaries. Accordingly, the Partnership may pursue Rule 9011 sanctions with respect to the fee application.

 The Partnership asserts that the fee application violates Rule 9011 because it is not "well grounded in fact." The standard for determining whether a document is well grounded in fact is one of "objective reasonableness" or, stated another way, whether the signer has made "a reasonable inquiry into the facts and the law before filing [the document]...." *Business Guides,* 498 U.S. at 551, 111 S.Ct. at 933; *accord Cleveland Demolition Co. v. Azcon Scrap Corp.,* 827 F.2d 984, 987 (4th Cir.1987). Rule 9011 "punishes the filing of a pleading, motion, or other paper that a reasonable attorney would recognize as frivolous." *Forrest Creek Assocs., Ltd. v. McLean Sav. & Loan Ass'n,* 831 F.2d 1238, 1245 (4th Cir.1987) (internal quotation marks omitted). At the same time, factual inaccuracies and problems resulting from inartful pleading do not necessarily make a document "groundless" or "unwarranted" so long as the signer made a reasonable investigation into both the facts and law. *Simpson v. Welch,* 900 F.2d 33, 36 (4th Cir. 1990); *Forrest Creek,* 831 F.2d at 1244–45. "[W]here there is *no* factual basis for a plaintiff's allegations, the complaint violates Rule

---

**43.** Ex. # 2.

**44.** *See* Ex.F.

**45.** Ex. # 7.

11's factual inquiry requirement." *Brubaker v. City of Richmond,* 943 F.2d 1363, 1373 (4th Cir.1991).

■■■ The Bankruptcy Code permits the courts to award "reasonable compensation for actual, necessary services rendered by ... [an] attorney ... based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title." 11 U.S.C. § 330(a)(1). To determine whether the fees requested are "reasonable," we look to the twelve-factor test set forth in *Barber v. Kimbrell's, Inc.,* 577 F.2d 216, 226 n. 28 (4th Cir.), *cert. denied,* 439 U.S. 934, 99 S.Ct. 329, 58 L.Ed.2d 330 (1978).[46] As noted earlier, the first phase of this proceeding dealt with whether Akin Gump's fee application was reasonable and satisfied the other elements of § 330(a). Although we modified the compensation award to reflect the $175–per–hour ceiling, we nevertheless approved Akin Gump's request, so we cannot conclude that the fee application is devoid of any factual foundation. In this limited instance, we note that the fee application itself reviews the entire course of the representation, covering many of the facts and circumstances we mentioned in the first part of this opinion. Attached to the application is an exhibit providing a detailed breakdown of the time spent and the amounts charged for each task performed during the representation. We found that this information was well-founded and relevant as to whether Akin Gump could recover fees and expenses under § 330(a). The Partnership suggests that the application is not "well grounded in fact" because it misidentifies the Partnership as the source of the $75,000 retainer.[47] Yet in light of the foregoing, we do not believe this inaccuracy renders the application devoid of any factual basis.

■■ Of greater concern, however, is the failure of Akin Gump to disclose initially the removal of funds from the escrow account. Although the fee application mentions the $75,000 retainer, it does not divulge the fact that Akin Gump drew on the retainer and the $1,200 refund without first obtaining court approval. It was not until the first hearing on the fee application that Akin Gump disclosed the removal of funds and it was not until the second hearing, one month later, that Akin Gump presented the Court with a full accounting of the situation. This is a significant omission from the fee application. The question thus presented is whether this important omission violates Rule 9011.

■■■ Factual omissions may be sanctionable under Rule 9011 when the omitted facts are material to the case at hand. *See Midlantic Nat'l Bank v. Kouterick,* 167 B.R. 353, 364 (Bankr.D.N.J.1994). What constitutes a material fact "depends upon applicable substantive law." *Id.* The applicable law in this instance is 11 U.S.C. § 330(a), which permits an award of fees and expenses only after notice and an opportunity for a hearing are given. To ensure that the courts, the United States Trustee and other parties-in-interest are fully apprised of the situation, Federal Rule of Bankruptcy Procedure 2016(a) requires all fee applications to "include a *statement* as to what *payments have theretofore been made* ... to the applicant for services rendered ... in any capacity whatsoever in connection with the case...." (Emphasis added). At first glance, it appears that Rule 9011 would not apply to such a "statement" because the rule encompasses "[e]very petition, pleading, motion and other paper ... *except* a list, schedule, or *statement,* or amendments thereto...." Fed. R.Bankr.P. 9011(a) (emphasis added). Yet we agree with the court in *Cohn v. United States Trustee (In re Ostas),* 158 B.R. 312,

---

**46.** These factors "include: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained;

(9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases." *Id.*

**47.** Ex. # 7, ¶ 19.

319 (N.D.N.Y.1993) that the "except" clause only applies to the "lists," "schedules," and "statements" filed under Federal Rule of Bankruptcy Procedure 1007. Thus we conclude, again, that the requirements of Rule 9011 apply to Akin Gump's fee application.

At the first hearing in May, Samorajczyk admitted that he was aware of the unauthorized withdrawals when the fee application was filed.[48] Samorajczyk first explained that the fee application did not disclose the withdrawals because he intended to give the Partnership a credit for the interest that would have otherwise accrued on the amounts withdrawn.[49] Upon further questioning, Samorajczyk altered his explanation, and testified that the omission resulted from the failure of his paralegal to follow his instructions in preparing the relevant documents.[50] At this same hearing, which occurred one month after Akin Gump filed its fee application, Samorajczyk erroneously testified that the amounts withdrawn had been restored.[51] Further questioning at this hearing revealed, however, that he was uncertain as to when the funds had been put back.[52]

The foregoing presents a troubling situation. Not only did the fee application fail to disclose the withdrawal of funds, but the erroneous information Samorajczyk gave at the first hearing reveals that he failed to conduct a reasonable investigation in order to correct the problem and to report it accurately. We believe an attorney in Samorajczyk's position acting prudently would have appreciated the gravity of the situation, and would have taken all necessary steps to ensure that the amounts removed were fully restored. Consistent with Rule 2016, a reasonable attorney in Samorajczyk's position would have thoroughly investigated the incident, and would have provided full disclosure to the Court before any objections could have been raised against the fee application. It could be argued, of course, that Samorajczyk's knowledge is irrelevant because another Akin Gump attorney, Linda S. Broyhill, signed the fee application. Yet Samorajczyk

is an Akin Gump partner, and Akin Gump is a "represented party" in this instance. It is therefore subject to Rule 9011 sanctions.

Although we are troubled by the initial lack of disclosure, we cannot find that the omission rises to the level of a Rule 9011 violation. As explained before, a fee application often rests on additional facts that are relevant to the work accomplished, the reasonableness of the fees, and the like. At the previous hearings, we found these facts in Akin Gump's fee application to be well-founded. Although Akin Gump's failure to disclose the information is significant, we do not believe the omission renders the fee application "baseless" or devoid of any factual foundation that would give rise to a Rule 9011 violation. See Brubaker, 943 F.2d at 1373 (stating that a pleading is not "well grounded in fact" when there is "no factual basis" for the allegations made). This circumstance distinguishes the situation at hand from other cases where the omitted fact was central to the pleading signed. See, e.g., In re Ronco, Inc., 838 F.2d 212, 218 (7th Cir.1988); Ostas, 158 B.R. at 318–22.

Additionally, we believe that under the interpretation of Rule 9011 in this circuit, the fee application is still legally tenable even though the omission violates Rule 2016. In the view of the Court of Appeals for the Fourth Circuit, a pleading or paper is not legally tenable under Rule 11 if it has "absolutely no chance of success under the existing precedent." Brubaker, 943 F.2d at 1373 (quoting Cleveland Demolition Co., 827 F.2d at 988). Although a violation of Rule 2016 is significant, it does not require a denial of the fee application. The courts have discretion in determining whether a request for compensation should be denied as a result of an attorney's failure to provide full disclosure. As the court stated in In re Saturley, 131 B.R. 509 (Bankr.D.Me.1991), "[a]nything less than the full measure of disclosure leaves counsel at risk that all compensation may be denied." Id. at 517 (em-

48. Tr. of May 18, at 88.

49. Id.

50. Id. at 88–89.

51. Id. at 24.

52. Id. at 85–86.

phasis added). Even though the courts *may* deny compensation, there is no absolute rule requiring them to do so. Hence, even though the fee application failed to divulge the removal of funds, we cannot conclude that it has "absolutely no chance of success" under existing precedent. We therefore find no violation of Rule 9011.

■ This does not mean, however, that the courts lack power to address cases similar to ours. There are instances where Rule 11 cannot reach the conduct at issue, and thus the courts look to other powers that are either incident to the federal judiciary or otherwise available through statute. *See e.g., United States v. Shaffer Equip. Co.*, 11 F.3d 450, 458 (4th Cir.1993). We turn our attention to these powers, particularly the powers of contempt.

## F.

The United States Supreme Court emphasized in *Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) that neither Rule 11 nor any statutes displaced the inherent power of the courts to impose sanctions for misconduct or to provide other forms of remedy. *Id.* at 46, 111 S.Ct. at 2133. Among the other powers mentioned in *Chambers* was the ability to hold a party in contempt for violating an order. *Id.* at 44, 111 S.Ct. at 2132. Although the Partnership's motion does not mention contempt as a basis for recovering sanctions, the Partnership did raise the issue of contempt in a subsequent brief, so we address it below.

■ Contempts that occur outside the presence of the court are divided into two categories: civil contempt and criminal contempt. Civil contempt serves two remedial functions. One is to coerce a party into compliance with a court order while the other is to compensate those who have been harmed by the contemnor's failure to comply with the order. *United States v. United Mine Workers*, 330 U.S. 258, 303, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947); *Eck v. Dodge Chemical Co. (In re Power Recovery Sys., Inc.)*, 950 F.2d 798, 802 (1st Cir.1991); *In re Snider Farms, Inc.*, 125 B.R. 993, 997 (Bankr.N.D.Ind.1991). Because civil-contempt sanctions are designed to either com-

pensate or coerce, they "may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard. Neither a jury trial nor proof beyond a reasonable doubt is required." *International Union v. Bagwell*, — U.S. —, —, 114 S.Ct. 2552, 2557, 129 L.Ed.2d 642 (1994) (footnote omitted). As non-Article III tribunals, bankruptcy courts do not have the inherent power to hold a party in civil contempt, but they may do so through the statutory grant of 11 U.S.C. § 105(a). *See Burd v. Walters (In re Walters)*, 868 F.2d 665, 669 (4th Cir.1989).

■ The Partnership suggests that, as a civil-contempt sanction, we should disallow Akin Gump's compensation or award damages to the Partnership. We find no basis, however, for imposing the civil-contempt sanctions requested by the Partnership. As emphasized above, Akin Gump has replaced the retainer and refund with interest. Thus, there is no reason to coerce Akin Gump into compliance with the August 4th Order since it already has purged itself of civil contempt. Furthermore, as we have also discussed above, the Partnership has not suffered any harm or injury resulting from Akin Gump's conduct, and accordingly there is no reason to award money damages to the Partnership.

■ In contrast to civil-contempt sanctions, criminal-contempt sanctions "are punitive in their nature and are imposed for the purpose of vindicating the authority of the court." *Power Recovery Sys.*, 950 F.2d at 802 n. 18 (citing *United Mine Workers*, 330 U.S. at 302, 67 S.Ct. at 700). One form of criminal-contempt sanction is a "fine [that] is neither compensatory nor conditioned on future violations of the [c]ourt's order...." *Snider Farms*, 125 B.R. at 997; *see United States v. Troxler Hosiery Co.*, 681 F.2d 934, 936 (4th Cir.1982). Because "[c]riminal contempt is a crime in the ordinary sense," *Bloom v. Illinois*, 391 U.S. 194, 201, 88 S.Ct. 1477, 1481, 20 L.Ed.2d 522 (1968), criminal-contempt sanctions may not be imposed without the protections afforded to the accused in criminal proceedings, such as the right to a jury trial and proof beyond a reasonable doubt. *Bagwell*, — U.S. at —, 114 S.Ct. at 2557. Neither the Supreme Court nor the

Court of Appeals for the Fourth Circuit has resolved whether bankruptcy courts—as non-Article III tribunals—have the power to impose criminal-contempt sanctions.

■ The Partnership argues that there is a split of authority as to whether bankruptcy courts have the power to impose sanctions for criminal contempt, and it further suggests that we ought to "resolve" this split in favor of using criminal-contempt powers. We decline the Partnership's invitation for three reasons. First, the relief sought by the Partnership is not in the nature of a criminal-contempt sanction. Here, the Partnership urges us to disallow Akin Gump's fees and expenses. If we imposed any monetary sanction for criminal contempt, the sanction would have to be in the form of a fine payable to the Court, see 18 U.S.C. § 401; *Hicks v. Feiock*, 485 U.S. 624, 632, 108 S.Ct. 1423, 1429, 99 L.Ed.2d 721 (1988) ("If the relief provided is a fine, it is remedial when it is paid to the complainant, and punitive when it is paid to the court...."), which would not release the Partnership from any obligation to pay Akin Gump's legal bills. Additionally, any concept of criminal restitution does not apply here, for Akin Gump has already restored the funds taken from the escrow account with interest. Finally, it is important to emphasize that the current proceeding is civil, not criminal. However, were it criminal, we would note that Akin Gump has not been afforded the constitutional protections that criminal defendants are entitled to. *Cf. Bagwell*, —— U.S. ——, —— – ——, 114 S.Ct. at 2557, 2562–63. We therefore conclude that the Partnership's motion is an inappropriate vehicle for imposing criminal-contempt sanctions.

### G.

■ This, however, does not end the matter. As indicated earlier, we have based our conclusions on the unique facts presented in this case and on the law cited by the Partnership. Although we have concluded that the Partnership is not entitled to any sanctions or recovery, we are still concerned by the undisputed fact that Akin Gump drew on the funds deposited in the escrow account without court approval. Also troubling is the fee application signed by Linda S. Broyhill, which violated Rule 2016(a) by failing to disclose the unauthorized withdrawals. These violations undermine the administrative claims process in general, and cannot not go unnoticed by the Court. Section 105 of the Bankruptcy Code grants the Court broad equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). The administrative claims process is an integral component of bankruptcy, and we believe § 105 vests this Court with sufficient authority to ensure that the requirements for obtaining compensation are complied with.

■ In other cases where fee applicants have not complied with the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure, the courts have either disallowed or limited compensation. See, e.g., *In re Saturley*, 131 B.R. 509 (Bankr.D.Me.1991); *In re Meyer*, 50 B.R. 3 (Bankr.S.D.Fla.1985). The power to deny or limit compensation is, of course, discretionary. *See* 11 U.S.C. § 330(a) (providing that upon notice and an opportunity to be heard, a court "may" award reasonable compensation). Moreover, to the extent we contemplate the disallowance of fees as a sanction, we are guided by the overall principle that the courts should impose the least severe sanction adequate to serve the purposes of the rule or statute infringed. *Cf. Spallone v. United States*, 493 U.S. 265, 276, 110 S.Ct. 625, 632, 107 L.Ed.2d 644 (1990) ("[I]n selecting contempt sanctions, a court is obliged to use the least possible power adequate to the end proposed....") (internal quotation marks omitted); *Cabell v. Petty*, 810 F.2d 463, 466 (4th Cir.1987) (holding that, for Rule 11 violations, courts should impose "the least severe sanction adequate to serve the purpose....") (quoting Hon. William W. Schwarzer, *Sanctions Under the New Federal Rule 11—A Closer Look*, 104 F.R.D. 181, 201 (1985)).

The Partnership urges us to deny the award of fees and expenses to Akin Gump, but we decline to do so. As explained above, Akin Gump's conduct harmed neither the Partnership, Palumbo, nor even his creditors. At the previous hearings, Akin Gump was

candid, albeit mistaken at times, about the situation involving the escrow account, and we have taken this into consideration in deciding how to address the incident. Both Samorajczyk and Broyhill have practiced before this Court for many years, and their conduct in other cases has been exemplary. This incident hardly coincides with that prior conduct. Thus, where the Partnership prefers to see lack of integrity, we only see poor practice in this very limited instance, *cf.* Schwarzer, *supra,* 104 F.R.D. at 201, perhaps as a result of the billing practices that existed at Akin Gump before they joined the firm. Accordingly, an outright denial of compensation, or a monetary award directed to the Partnership, would not constitute the least severe sanction.

We conclude, instead, that the least severe sanction should be a warning. We admonish Akin Gump not to allow this situation to occur again. Collecting compensation without court approval not only violated the August 4th Order, but it also undermined the integrity of this Court and the administrative claims process. So too, the failure to disclose up front the unauthorized withdrawal of funds was contrary to Federal Rule of Bankruptcy Procedure 2016(a). Such omissions mislead the Court and others into the false sense that an order allowing compensation is ready for entry. As the court in *Saturley* explained, "[t]o condemn these shortcomings is not simply nitpicking. Neither does it represent an inflexible insistence that counsel strictly satisfy sterile formalities. Timely, thorough and ingenuous disclosures are essential to implementing the Code's policies protecting the integrity of the bankruptcy process." 131 B.R. at 517. The *Saturley* court's observations are applicable here, even though we have decided to allow compensation.

Consistent with the equitable powers available under 11 U.S.C. § 105, we direct Samorajczyk and Broyhill to prepare, sign, and file a report specifying the steps Akin Gump has taken to ensure that this type of incident does not occur again. At the previous hearings, Samorajczyk testified that the withdrawals resulted from practices within Akin Gump's billing department. Samorajczyk ex-

plained that, unlike the practice at Hazel & Thomas, his former firm, Akin Gump could not show a credit on its bills without actually drawing on the funds held in the retainer account. To be certain that Akin Gump is in compliance with 11 U.S.C. § 330(a), we will require the aforesaid report to be filed.

### III.

For the foregoing reasons, we grant Akin Gump's motion to dismiss and accordingly dismiss the Partnership's motion for sanctions. An appropriate order will be entered.